781 A.2d 851

George GALLOWAY, Jr.

v.

STATE of Maryland.

No. 21, Sept. Term, 2000.

Court of Appeals of Maryland.

Sept. 19, 2001.

604

Claudia A. Cortese, Asst. Public Defender (Stephen E. Harris, Public Defender, on brief) Baltimore, for petitioner.

Kathryn Grill Graeff, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. of Maryland, on brief) Baltimore, for respondent.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY,* RAKER, WILNER, CATHELL and HARRELL, JJ.

HARRELL, Judge.

George M. Galloway, Jr., Petitioner, while serving a sentence for prior convictions, was charged with harassment and stalking, pursuant to Md.Code (1957, 1996 Repl.Vol.), Art. 27, § 121A,[1] for letters he wrote from prison to the victim of the crimes for which he was imprisoned. On 26 October 1998, a pre-trial hearing was held in the Circuit Court for Anne Arundel County on Galloway's written motion to dismiss challenging the constitutionality of the statute on its face and as applied to his conduct. After hearing argument from the parties and upon their urging, the court reserved its ruling on the motion. Petitioner then waived his right to a jury trial

---

* Rodowsky, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

1. The current harassment statute is Md.Code (1957, 1996 Repl.Vol., 2000 Cum.Supp.), Art. 27 § 123. The current statute was effective as of 1 October 1998 and redesignated former § 121A to be the present § 123. No substantive changes were made otherwise. Therefore, § 123 will be referred to in this opinion.

and agreed to proceed with a bench trial on an agreed statement of the facts and a not guilty plea. Galloway moved for judgments of acquittal at the end of the recitation of the agreed facts. The court took the case under advisement.

The Circuit Court, in a written opinion and order dated 28 October 1998, denied Petitioner's motion to dismiss and motion for judgment of acquittal with regard to the charge of harassment. The court denied the motion to dismiss, but granted the motion for judgment of acquittal, as to the charge of stalking.[2] On 4 November 1998, after entertaining further argument from counsel, the court found Galloway guilty of the crime of harassment. Sentencing proceeded immediately, and Galloway was sentenced to 90 days incarceration for the conviction. On direct appeal, the Court of Special Appeals affirmed Galloway's conviction of harassment. *Galloway v. State*, 130 Md.App. 89, 744 A.2d 1070 (2000). We granted Petitioner's petition for writ of certiorari. *Galloway v. State*, 358 Md. 608, 751 A.2d 470 (2000). We agreed to consider the following question:

> Did the trial court err in denying Petitioner's motion to dismiss and in convicting him of harassment under Md.Code (1957, 1996 Repl.Vol.), Art. 27 § 121A, now codified with minimal changes as § 123, specifically in the face of a challenge that the statute is unconstitutionally vague and overbroad on its face and as applied to Petitioner and in the face of a challenge that the facts did not support such a conviction?

## I.

In 1995, Galloway was convicted of stalking and kidnapping Kimberly Javin (Javin), his "common law wife." For these

---

**2.** In his 28 October 1998 written opinion and order, the trial judge stated that he granted both the motion to dismiss and the motion for judgment of acquittal with regard to the charge of stalking. At a hearing on 4 November 1998, the trial judge made a verbal correction; as to the stalking charge, the motion to dismiss was denied, and the motion for judgment of acquittal was granted.

crimes, he was sentenced to twelve years incarceration at the Maryland Correctional Training Center (MCTC). It was while serving this sentence that it was alleged that he committed the crime of harassment which is the subject of the present case. According to the agreed statement of facts, between 11 April 1997 and 11 March 1998 he sent 122 letters to Javin at her residence. In addition, he sent an additional 11 letters to her in care of Javin's parents to their home address. Both before and after 17 April 1997, Javin, her parents, Galloway's former attorney in the kidnapping/stalking case, and the assistant warden and a correctional psychologist at MCTC, requested of Galloway that he not send letters to Javin. The prosecution, at the 4 November 1998 hearing, stated that at least five people, including Javin, told Galloway *directly* to stop writing these letters.

By stipulation, the parties agreed that Javin, if called to testify, would state that "the letters seriously alarmed her and caused her to fear for her life on or after ... [Galloway's] release date, which she believ[ed] to be April of 1999." It was agreed further that Javin would testify that her fears stemmed from the fact that Galloway was serving a prison term after having been convicted of stalking and kidnaping her on 20 March 1995. As a condition of his sentence and future probation flowing from those crimes, Galloway was to have no contact with Javin. The parties also agreed that Javin felt that Galloway's continuing reference in his letters to Javin "to him being Moses and the enforcer of the law and God's and Jesus's ambassador mean[t] that he [would] kill her so that they [could] be with God," notwithstanding that one of the letters containing this language began with the words "[n]othing in this letter is meant to be a threat." [3]

---

**3.** The Dissent benignly characterizes the letters as containing "religious views, expressions of feelings, and apologies for past conduct." Dissent, op. at 652, 660, 656, 677. Such a description is generous to a fault. The letters provided in the record contain such representative statements (repeated numerous times throughout the letters) as "they will cast you into ... hell"; "my words are not my words, they are Gods [sic] words that he taught me to say ... God and Jesus taught me

Galloway was charged with harassment and stalking. Maryland Code, (1957, 1996 Repl.Vol., 2000 Cum.Supp.), Article 27, § 123, the harassment statute, provides:

(a) *Course of conduct defined.*—In this section "course of conduct" means a persistent pattern of conduct, composed of a series of acts over a period of time, that evidences a continuity of purpose.

(b) *Applicability.*—This section does not apply to any peaceable activity intended to express political views or provide information to others.

(c) *Prohibited Conduct.*—A person may not follow another person in or about a public place or maliciously engage in a course of conduct that alarms or *seriously* annoys another person: [4]

(1) With intent to harass, alarm, or annoy the other person;

---

many things about us, and what happened to us, and what I must do for us. You are not cooperating with us"; "your lies are about to turn on you because you refuse to listen"; "I am God's and Jesus' ambassador"; "I am God's representative"; "you fear me. You fear what you don't understand"; "you have received feminist indoctrination"; "what is about to happen needs to happen"; "no one in this country has a right to stop me from what I have been doing." The letters also contain such passages as

> I went to prison because of love and lies. God knows this, and I could care less what society thinks. I have to answer to God for allowing the devil to deceive them. You are not prepared for what lies ahead of you. What you have sowed will come back to haunt you.

The letters also express such sentiments as

> until you make the choice to face your problems and solve your problems you will live in torment and may do time in Prison like I did time.... [Y]ou are forcing me into shaming you and possibly putting you in jail and prisons.... You have made people believe your lies in the past and present. I am about to shine some serious light onto this situation.... I am only trying to do the will of God. You are doing the will of the devil ... I have already been judged. I received life with our two children, who will be coming with Jesus and many angels in the future. You are not prepared for what lies ahead.

4. It is important to note the adverb "seriously." The Dissent, although it necessarily includes lip service reference (*see* Dissent, p. at 652, 678), largely ignores in its analysis the significance of this requirement.

(2) After reasonable warning or request to desist by or on behalf of the other person; and

(3) Without a legal purpose.

(d) *Penalty.*—A person who violates this section is guilty of a misdemeanor and, upon conviction, is subject to a fine not exceeding $500 or imprisonment for not more than 90 days or both. (Emphasis added).

The trial judge acquitted him of the stalking charge, but found him guilty of the harassment charge. Galloway argued that § 123 is unconstitutionally vague and overbroad under the U.S. Constitution[5] and, in the alternative, that the evidence is insufficient to support a conviction of harassment under § 123. According to the trial judge, § 123 is neither unconstitutionally vague or overbroad. The judge, in his written opinion, stated that § 123 is "constitutional as ... [it] does not suffer from vagueness" and "that the meaning of the statutes have been fairly ascertained by judicial determinations." (Citing *Streater v. State*, 119 Md.App. 267, 704 A.2d 541 (1998), *rev'd on other grounds*, 352 Md. 800, 724 A.2d 111 (1999); *Pall v. State*, 117 Md.App. 242, 699 A.2d 565 (1997)). The trial court also concluded that there was sufficient evidence to support Galloway's conviction of harassment based on the following:

> In sending the victim over 130 letters over the course of eleven months, the Court can find that [Galloway] maliciously engaged in a course of conduct that seriously alarmed and annoyed the victim. In repeating the same messages and expressing [Galloway's] desire to reunite with the victim, the Court can find that Defendant intended to harass

---

**5.** Galloway makes no arguments under the Maryland Constitution or Declaration of Rights. The Dissent states, however, that the "question encompasses vagueness and overbreadth under the Maryland Declaration of Rights as well as under the First and Fourteenth Amendments." Dissent, op. at 652, n. 1. It is clear, however, that Galloway did not mount such an argument (expressly, implicitly, or subliminally) under the Maryland Declaration of Rights in his petition for certiorari, brief or in his reply brief to this Court. Ordinarily, we do not supply arguments not presented or made by the parties. *Cf. Holbrook v. State*, 364 Md. 354, 772 A.2d 1240 (2001); *Jones v. State*, 357 Md. 408, 416, 745 A.2d 396, 401 (2000).

the victim. As [Galloway] admits in his letter that he knew that victim did not want him to contact her, the Court can find that [Galloway] received a reasonable request to desist. As these were personal letter [sic], the Court can find that they served no legal purpose. Therefore, the Motion for Judgment of Acquittal is denied.

The Court of Special Appeals affirmed the Circuit Court's judgment, agreeing that the language of § 123 was neither vague nor overly broad and that there was sufficient evidence to support a conviction of harassment.

In this opinion, we shall address the following: (1) is § 123 unconstitutionally vague; (2) is § 123 unconstitutionally overly broad; and, (3) if § 123 can withstand constitutional scrutiny, was the evidence adduced against Petitioner sufficient to support a finding of harassment. We determine, after examining the legislative history of § 123 and surveying the treatment accorded similar statutes by other courts, that a reasonable person standard should be read into the language of subsection (c)(1) of § 123, and with that judicial gloss, § 123 survives constitutional scrutiny.[6] We further conclude that the evidence is sufficient to support Petitioner's conviction of harassment.

## II. Constitutionality of § 123

In determining the constitutionality of statutes, "[t]he basic rule is that there is a presumption" that the statute is valid. *State v. Wyand,* 304 Md. 721, 727, 501 A.2d 43, 46 (1985) (internal quotation marks omitted) (quoting *Supermarkets Gen. Corp. v. State,* 286 Md. 611, 409 A.2d 250

---

**6.** Respondent argues that only the constitutionality of the use of the words "annoy" and "alarm" may be raised here because Petitioner, in the Court of Special Appeals and in his petition for writ of certiorari, only challenged the use in the statute of the words "annoy" and "alarm" as unconstitutionally vague. Respondent's Br. at 8 (citing *Wynn v. State,* 351 Md. 307, 324, 718 A.2d 588 (1998); *State v. Rose,* 345 Md. 238, 243, 691 A.2d 1314 (1997); *McElroy v. State,* 329 Md. 136, 146, 617 A.2d 1068 (1993)). The question posed in the granted certiorari petition, however, is whether the statute is unconstitutionally vague and overbroad. *See supra* p. 606.

(1979)), *cert. denied,* 475 U.S. 1095, 106 S.Ct. 1492, 89 L.Ed.2d 893 (1986). We are reluctant to find a statute unconstitutional if, "by any construction, it can be sustained." *Beauchamp v. Somerset County,* 256 Md. 541, 547, 261 A.2d 461, 463 (1970). If, however, a statute violates a "mandatory provision" of the Constitution, "we are required to declare such an act unconstitutional and void." *Id.; see Cohen v. Governor of Maryland,* 255 Md. 5, 22, 255 A.2d 320, 328 (1969). Therefore, if it is established that a statute is vague—offends due process [7]— and/or overbroad—sweeps within the ambit of constitutionally "protected expressive or associational rights" [8]—then the statute is unconstitutional. The party attacking the statute has the burden of establishing its unconstitutionality.[9] *Beau-*

---

**7.** *See Williams v. State,* 329 Md. 1, 8, 616 A.2d 1275, 1278 (1992) (stating that the vagueness doctrine is "rooted in the fourteenth amendment's guarantee of procedural due process"); *Eanes v. State,* 318 Md. 436, 459, 569 A.2d 604, 615 (1990) (discussing how vagueness is "based on fourteenth amendment due process or fairness concerns"), *cert. denied,* 496 U.S. 938, 110 S.Ct. 3218, 110 L.Ed.2d 665; *see also* LAURENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW (2d.1988) § 10–8, at 684 ("Life, liberty and property could not, furthermore, be taken by virtue of a statute shows terms were 'so vague, indefinite and uncertain' that one cannot determine their meaning." (footnote omitted)); *id.* § 12–31, at 1033 ("As a matter of due process, a law is void on its face if it is so vague that persons 'of common intelligence must necessarily guess at its meaning and differ as to its application.'" (quoting *Connally v. General Construction Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926))).

**8.** TRIBE, *supra* note 7, § 12–27, at 1022 (citing *Thornhill v. Alabama,* 310 U.S. 88, 97, 60 S.Ct. 736, 84 L.Ed. 1093 (1940)).

**9.** The Dissent acknowledges the general applicability of this statement. Dissent, op. at 654. The Dissent is also correct in stating that "[w]hile these principles are generally applicable in resolving constitutional challenges, nevertheless, when a statute or other government action interferes with speech or other freedoms protected by the First Amendment ..., the statute or other government action is subject to scrutiny and must be justified by a showing of sufficient governmental interest." *Id.* The Dissent, however, is plainly wrong in concluding that the Majority has improperly placed the entire burden of establishing the unconstitutionality of the statute on Petitioner. Dissent, op. at 656. That to which the Dissent refers is only applicable when the statute in question regulates speech. Dissent, op. at 655. We determine, however, that the § 123 regulates unprotected conduct. *See infra* pp. 42–46.

*champ,* 256 Md. at 547, 261 A.2d at 463 (citing *National Can Corp. v. State Tax Comm'n,* 220 Md. 418, 153 A.2d 287 (1959), *appeal dismissed,* 361 U.S. 534, 80 S.Ct. 586, 4 L.Ed.2d 538 (1960)). Petitioner fails to shoulder this burden in the present case.

### A. *Legislative History. of § 123*

According to the 1986 Maryland Laws, chapter 721, the purpose of § 123 is

> prohibiting a person from following another person in a certain manner or from engaging in certain other conduct under certain circumstances; defining a certain term; providing penalties for a violation of this Act; providing that this act does *not* apply to certain conduct; and generally relating to the crime of harassment. (Emphasis added).

---

Lawrence Tribe described the differences in the two types of analysis: The Supreme Court has evolved two distinct approaches to the resolution of first amendment claims; the two correspond to the two ways in which government may "abridge" speech. If a government regulation is aimed at the communicative impact of an act, analysis should proceed along what we will call *track one.* On that track, a regulation is unconstitutional unless government shows that the message being suppressed poses a "clear and present danger," constitutes a defamatory falsehood, or other wise falls on the unprotected side of one of the lines the Court has drawn to distinguish those expressive acts privileged by the first amendment from those open to government regulation with only minimal due process scrutiny. If a government regulation is aimed at the noncommunicative impact of an act, its analysis proceeds on what we will call *track two.* On that track, a regulation is constitutional, even as applied to expressive conduct, so long as it does not unduly constrict the flow of information and ideas. On track two, the "balance" between the values of freedom of expression and the government's regulatory interests is struck on a case-by-case basis, guided by whatever unifying principles may be articulated. TRIBE, *supra* note 7, § 12–2, at 791–92. Tribe goes on to explain, for a statute that regulates speech based on its content to survive track one, the state must demonstrate that restriction is "necessary to serve a compelling state interest and ... narrowly drawn to that end." *Id.* § 12–3, at 798–99 (citation omitted) (alteration in original). It appears that the Dissent has determined that § 123 rides on track one, while the Majority concludes that it travels on track two.

There is no documentation in the bill file regarding whether this statute was modeled after that of another state, even though, as we discuss *infra*, other states have used identical or similar language in fashioning their harassment statutes and in defining the term "harass" in their statutes. The only other insight provided is in the *Summary of Committee Report on House Bill 381* (the bill from which the harassment statute came) prepared by the Senate Judicial Proceedings Committee. According to the *Report*, the proposed harassment statute

> will help law enforcement agencies in their attempts to defuse ongoing feuds and longstanding disputes between neighbors, former boyfriends and girlfriends, and adults which arise on a daily basis. The Baltimore Police Department testified that police departments' hands are virtually tied without this legislation. House Bill 381 would give law enforcement personnel the opportunity to avoid extreme situations which occur due to harassment and would allow the police to diffuse potentially harmful activity

> This bill also provides a vehicle for the relief of many victims of harassment who are without legal means to otherwise deal with the problem of harassment.

*Summary of Comm. Rep. on H.B. 381,* at 1–2 (1986). Though this *Report* is helpful in elaborating on the purpose of the harassment statute, it does not mention whether the Maryland statute was modeled after the harassment statutes of other states.

### B. Vagueness

Petitioner argues that the statute's use of the words "harass," "annoy," "alarm," and "without legal purpose" in § 123(c) and "political views or . . . information" in § 123(b) are unconstitutionally vague, even in light of *Eanes v. State,* 318 Md. 436, 569 A.2d 604 (1990), which advances the proposition that one must apply normal meanings to words of common understanding. Petitioner further maintains that the "use of these undefined terms effectively reduces the statutory language to such a state of uncertainty that it fails to delineate

the proscribed conduct in a clear and comprehensible manner creating an ambiguity of constitutional dimension which leaves individuals guessing at the statute's scope." Petitioner's Br. at 7. We disagree and conclude that, after applying *Eanes v. State*,[10] the language of § 123 withstands constitutional scrutiny.

■ The void-for-vagueness doctrine as applied to the analysis of penal statutes requires that the statute be "sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties." *Williams v. State*, 329 Md. 1, 8, 616 A.2d 1275, 1278 (1992) (internal quotation marks omitted) (quoting *Connally v. General Const. Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926)); *see Eanes*, 318 Md. at 458–59, 569 A.2d at 615; *Bowers v. State*, 283 Md. 115, 120, 389 A.2d 341, 345 (1978). A statute must fit this standard so as not to offend due process rights. *See supra* note 7. As the U.S. Supreme Court explained:

> It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application. Third, but related, where a vague statute "abut[s]

**10.** The Dissent, without elaboration, describes *Eanes* as "an aberrant decision." Dissent, op. at 654. We assume the justification for this characterization may be found in the dissent in *Eanes*, 318 Md. at 469, 569 A.2d at 620 (Eldridge, J., dissenting), to which the author apparently remains steadfast. Nonetheless, *Eanes*, not having been overruled, remains good law in Maryland.

upon sensitive areas of basic First Amendment freedoms," it "operates to inhibit the exercise of [those] freedoms." Uncertain meanings inevitably lead citizens to "steer far wider of the unlawful zone ... than if the boundaries of the forbidden areas were clearly marked."

*Grayned v. City of Rockford*, 408 U.S. 104, 108–09, 92 S.Ct. 2294, 2298–99, 33 L.Ed.2d 222 (1972) (alterations in original) (footnotes omitted) (internal quotation marks omitted).

 A well grounded principle in federal constitutional law is that, when considering the void-for-vagueness doctrine, courts consistently consider two criteria or rationales. *See, e.g., Williams*, 329 Md. at 8, 616 A.2d at 1278; *Eanes*, 318 Md. at 459, 569 A.2d at 615; *Bowers*, 283 Md. at 120–21, 389 A.2d at 345. The first rationale is the fair notice principle that "persons of ordinary intelligence and experience be afforded a reasonable opportunity to know what is prohibited, so that they may govern their behavior accordingly." *Williams*, 329 Md. at 8, 616 A.2d at 1278 (internal quotation marks omitted) (quoting *Bowers*, 283 Md. at 121, 389 A.2d 341); *see Ferro v. Lewis*, 348 Md. 593, 607, 705 A.2d 311, 318 (1998). The standard for determining whether a statute provides fair notice is "whether persons 'of common intelligence must necessarily guess at [the statute's] meaning.'" *Williams*, 329 Md. at 8, 616 A.2d at 1278 (alteration in original) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 607, 93 S.Ct. 2908, 2913, 37 L.Ed.2d 830 (1973)). A statute is not vague under the fair notice principle if the meaning "of the words in controversy can be fairly ascertained by reference to judicial determinations, the common law, dictionaries, treatises or even the words themselves, *if* they possess a common and generally accepted meaning." *Bowers*, 283 Md. at 125, 389 A.2d at 348 (emphasis added) (citations omitted); *see Eanes*, 318 Md. at 460, 569 A.2d at 615–16.

 The second criterion of the vagueness doctrine regards enforcement of the statute. This rationale exists "to ensure that criminal statutes provide 'legally fixed standards and adequate guidelines for police, judicial officers, triers of

fact and others whose obligation it is to enforce, apply and administer the penal laws.'" *Williams,* 329 Md. at 8 9, 616 A.2d at 1278 (quoting *Bowers,* 283 Md. at 121, 389 A.2d 341). To survive analysis, a statute must "eschew arbitrary enforcement in addition to being intelligible to the reasonable person." *Williams,* 329 Md. at 9, 616 A.2d at 1279. In *Bowers,* we determined that, as to this standard, a statute is not unconstitutionally vague

> merely because it allows for the exercise of some discretion on the part of law enforcement and judicial officials. It is only where a statute is so broad as to be susceptible to irrational and selective patterns of enforcement that it will be held unconstitutional under this second arm of the vagueness principle.

283 Md. at 122, 389 A.2d at 346; *see Eanes,* 318 Md. at 464, 569 A.2d at 617.

As a general rule, the application of the void-for-vagueness doctrine is based on the application of the statute to the "facts at hand." *Bowers,* 283 Md. at 122, 389 A.2d at 346 (citing *United States v. Powell,* 423 U.S. 87, 92, 96 S.Ct. 316, 46 L.Ed.2d 228 (1975); *United States v. Mazurie,* 419 U.S. 544, 550, 95 S.Ct. 710, 42 L.Ed.2d 706 (1975); *United States v. National Dairy Corp.,* 372 U.S. 29, 32–33, 83 S.Ct. 594, 9 L.Ed.2d 561 (1963)). Thus, "it will usually be immaterial that the statute is of questionable applicability in foreseeable marginal situations, if a contested provision clearly applies to the conduct of the defendant in a specific case." *Id.* (citing *United States v. Petrillo,* 332 U.S. 1, 7, 67 S.Ct. 1538, 91 L.Ed. 1877 (1947)).

If the challenged statute, however, encroaches upon fundamental constitutional rights, particularly First Amendment guarantees of free speech and assembly, then the statute should be scrutinized for vagueness on its face.[11] *Id.;*

---

11. We have not applied this standard to a facial challenge other than one implicating First Amendment rights. *See Bowers v. State,* 283 Md. 115, 123–24, 389 A.2d 341, 346–47 (1978). Other jurisdictions, howev-

*Ayers v. State,* 335 Md. 602, 624, 645 A.2d 22, 33 (1994), *cert. denied,* 513 U.S. 1130, 115 S.Ct. 942, 130 L.Ed.2d 886 (1995). Thus, "not only may the two vices of inadequate notice and insufficient adjudicative [or enforcement] guidelines be present, but in addition the indefiniteness of the statute itself may inhibit the exercise of protected freedoms." *Bowers,* 283 Md. at 122, 389 A.2d at 346 (citing *Winters v. New York,* 333 U.S. 507, 509, 68 S.Ct. 665, 92 L.Ed. 840 (1948); *National Dairy Corp.,* 372 U.S. at 36, 83 S.Ct. 594, 9 L.Ed.2d 561). Because of the potential "chilling effect" that vagueness can have on First Amendment liberties, permitting a defendant to challenge a statute on its face for vagueness becomes a "rule of standing which allows a defendant to challenge the validity of a statute even though the statute as applied to the defendant is constitutional." [12] *Ayers,* 335 Md. at 625, 645 A.2d at 33. As we stated in *Bowers:*

> So considered, the principle is essentially a rule of standing, permitting a defendant to challenge the validity of a statute as applied to marginal cases, even though the acts for which he has been charged may be squarely within the coverage of

---

er, have determined that this standard is triggered "whenever an ill-defined penal statute is alleged to infringe upon *any* of the fundamental freedoms protected under the Bill of Rights." *Id.* (citing *People v. Barksdale,* 8 Cal.3d 320, 105 Cal.Rptr. 1, 503 P.2d 257, 260 (1972) (privacy); *Lakewood v. Pillow,* 180 Colo. 20, 501 P.2d 744 (1972) (right to bear arms)).

**12.** Justice White, joined by Chief Justice Burger and Justice Blackmun, in his dissent in *Coates v. Cincinnati,* 402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971), explained this principle thusly:

> Although a statute may be neither vague, overbroad, nor otherwise invalid as applied to the conduct charged against a particular defendant, he is permitted to raise its vagueness or unconstitutional over breadth as applied to others. And if the law is found deficient in one of these respects, it may not be applied to him either, until and unless a satisfactory limiting construction is placed on the statute. The statute, in effect, is stricken down on its face. This result is deemed justified since the otherwise continued existence of the statute in unnarrowed form would tend to suppress constitutionally protected rights.

*Coates,* 402 U.S. at 619–20, 91 S.Ct. at 1691, 29 L.Ed.2d 214 (citations omitted).

the statute. Once it is determined, however, that a strict specificity standard ought to apply in any given case, the criteria for measuring the validity of a statute under the vagueness doctrine are the same as in a non-First Amendment context: fair warning and adequate guidelines.

*Bowers,* 283 Md. at 123, 389 A.2d at 346.

Although the Court of Special Appeals has determined that a telephone harassment statute using the words "annoy" and "harass" is not unconstitutionally vague,[13] *Caldwell v. State,* 26 Md.App. 94, 101–102, 337 A.2d 476, 481 (1975) (addressing the constitutionality of Maryland Code (1957, 1996 Repl.Vol.), Art. 27 § 555A), neither it nor we have addressed previously the potential vagueness of the words "harass," "annoy," "alarm," "without legal purpose," and "provide information" as used in § 123. Other states, however, have addressed the employment of these words and phrases in harassment and stalking statutes and have come out on either side of the fence, focusing most of their attention on the phrase "intent to annoy." *Cf.* M. Katherine Boychuk, *Are Stalking Laws Unconstitutionally Vague or Overbroad?,* 88 Nw. U.L.REV. 769, 796–97 (1994) ("Like the stalking laws, many harassment statutes require that the offender intend to alarm, annoy, or harass another person. Courts have treated such laws inconsistently." (footnotes omitted)). Accordingly, Petitioner urges us to adopt the reasoning used by those states that have found those statutes to be unconstitutionally vague, while Respondent advocates the path taken by the contrarian jurisdictions.

Although ultimately we shall not follow those jurisdictions that have found harassment statutes to be unconstitutionally vague, we briefly identify now the reasons that tip our analysis

---

**13.** In *Ayers v. State,* we declined to reach the issue of whether the term "harass" was unconstitutionally vague because the defendant had not been charged with harassment. *Ayers v. State,* 335 Md. 602, 625, 645 A.2d 22, 33 (1994), *cert. denied,* 513 U.S. 1130, 115 S.Ct. 942, 130 L.Ed.2d 886 (1995). We stated: "[i]f the indictment in this case charged Ayers with the crime of 'harassment,' we would be required to pass upon the constitutional vagueness, and claimed over breadth, of that undefined term." *Id.*

in the other direction and to which reasons we shall return later in our discussion for amplification. In short, even if arguably otherwise deficient, § 123 is salvageable because we shall employ a limiting construction to the statute to ensure that it provides a standard of conduct and indicates whose sensibilities are to be offended. *See, e.g., Schochet v. State,* 320 Md. 714, 729, 580 A.2d 176, 183 (1990) (stating that "[g]eneral statutes . . ., which, if given their broadest and most encompassing meaning, give rise to constitutional questions, have regularly been the subject of narrowing constructions so as to avoid the constitutional issues" and providing examples of such cases). Moreover, § 123 has inherent limitations. The statute requires a reasonable warning to desist, does not apply to "any peaceable activity intended to express political views or provide information to others," and mandates that there be no "legal purpose" for the activity. *Cf.* Boychuk, *supra,* at 791–92 (contending that providing an exemption of constitutionally protected activity or a court's assuming that a state legislature did not intend to prohibit any constitutionally protected conduct remedies vagueness problems (citing Richard H. Fallon, Jr., *Making Sense of Over breadth,* 100 YALE L.J. 853, 862 (1991))). Lastly, § 123 requires specific intent on the part of the offender, which assists in alleviating vagueness difficulties. *See, e.g., Williams,* 329 Md. at 9, 616 A.2d at 1279.

### i. State and Federal Courts: Finding Harassment Statutes Unconstitutionally Vague

Petitioner directs our attention to the Supreme Court of Colorado's determination in *People v. Norman,* 703 P.2d 1261 (Colo.1985), finding a particular harassment statute to be unconstitutionally vague. The harassment statute in question in *Norman* stated that harassment is committed " 'if with intent to *harass, annoy,* or *alarm* another person,' such person 'engages in conduct or repeatedly commits acts that *alarm* or *seriously annoy* another person and that serve no *legitimate purpose.*' " *Norman,* 703 P.2d at 1266 (emphasis added) (quoting COLO.REV.STAT. § 18–9–11(1)(d) (1978)). The

Colorado court based its reasoning on one of its earlier opinions, *Bolles v. People*, 189 Colo. 394, 541 P.2d 80 (1975), which held that the use of the words "harass" and "annoy" in subsection (1)(e) in the harassment statute was unconstitutionally broad.[14] *Norman*, 703 P.2d at 1266 (referring to COLO. REV.STAT. § 18–9–11(1)(e), which stated: "(1) A person commits harassment if, with intent to *harass, annoy,* or *alarm* another person, he . . . (e) communicates with a person, anonymously or otherwise by telephone, telegraph mail, or any other form of communication, in a manner *likely to harass or cause alarm . . . .*" (emphasis added)).

The court in *Norman* found fault with the phraseology of the statute. According to the court, the statute did not define any legislative concern, and the statute covered "any and all conduct, by any person." *Norman*, 703 P.2d at 1267. The court continued: "[a]n actor, a clown, a writer or a speaker all might be subject to criminal prosecution because their acts are perceived by some official to annoy or alarm others." *Id.* The court concluded that the statute was subject to such generality that it "exceeds the bounds of flexibility constitutionally available to the legislature," and, more importantly, that subsection (1)(d) "contains no *limiting* standards to assist citizens, courts, judges or police personnel to define what conduct is prohibited and, conversely, what conduct is permitted." *Id.* (emphasis added).

As we shall discuss further, Maryland's statute, though also employing the words "annoy" and "alarm," contains limiting language, and we are further willing to read a limiting "reasonable person" standard into the statute. *Cf.* Boychuk, *supra,* at 788 (contending that either a *judicial* or legislative formulation of an objective standard by which to judge harassment would save the statutes from constitutional demise). Moreover, Petitioner misapplies the *Norman* case in arguing

---

14. The court noted that subsection (1)(d) addressed conduct while (1)(e) addressed communications, but the court determined this distinction made no difference in its constitutional analysis. *People v. Norman,* 703 P.2d 1261, 1267 (Colo.1985).

for its application to § 123. The Colorado Supreme Court later emphasized that the phrases "intent to annoy" and "intent to alarm" alone are not unconstitutionally vague, but rather, coupled with restrictive language, other subsections of the same harassment statute withstand constitutional scrutiny. *See People v. McBurney*, 750 P.2d 916, 919–20 (Colo.1988) (stating that the *previous* sections of the *predecessor* harassment statute, as in *Bolles*, were not unconstitutional because of the "mere presence of the words 'annoy' and 'alarm,' but because these words were applied to *all* forms of communication, which obviously contained no particularized standards to limit the scope of the offense" (citing *Bolles*, 541 P.2d at 82–83)). The limiting language found significant in *McBurney* confined the statute only to harassing or obscene telephone calls. *Id.* (discussing COLO.REV.STAT. § 18–9–111(1)(e) (1986), which includes that a person commits harassment if, "with intent to harass, annoy, or alarm another person, he ... [i]nitiates communication with a person, anonymously or otherwise by telephone, in a manner intended to harass or threaten bodily injury or property damage, or makes any comment, request, suggestion, or proposal by telephone which is obscene").

Petitioner also relies on *Kansas v. Bryan*, 259 Kan. 143, 910 P.2d 212 (1996) in which the Supreme Court of Kansas held the Kansas stalking statute to be unconstitutionally vague due to its use of the terms "annoy," "alarm," and "harass" and without defining an objective standard.[15] *Bryan*, 910 P.2d at

---

15. Kansas's stalking statute states, in pertinent part:

(a) Stalking is an intentional and malicious following *or* course of conduct directed at a specific person when such following or course of conduct *seriously alarms, annoys or harasses* the person, and which serves no legitimate purpose.

. . .

(d) For the purposes of this section *'course of conduct'* means a pattern of conduct composed of a series of acts over a period of time, however short, evidencing a continuity of purpose and which would cause a *reasonable person* to suffer substantial emotional distress, and must actually cause substantial emotional distress to the person. Constitutionally protected activity is not included within the meaning of 'course of conduct.'

217, 219. According to the court's construction, the statute in question employed an objective standard in relation to a course of conduct that alarms, annoys, or harasses a person, but not in relation to the "following" of a person that achieves the same effect. *Id.* The Kansas court concluded that, following the reasoning in *Coates v. Cincinnati*, 402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971),[16] and the lack of an objective standard incorporated in the language of the statute with regard to the act of "following" a person, frames the statute so

*Kansas v. Bryan*, 259 Kan. 143, 910 P.2d 212, 216 (1996) (quoting KAN. STAT. ANN. § 21–3438 (Supp.1994)).

**16.** *Coates v. Cincinnati*, 402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971) is a much relied on case in opinions finding the use of "annoy" unconstitutionally vague. *See, e.g., Kramer v. Price*, 712 F.2d 174, 177–78 (5th Cir.1983) (per curiam), *vacated,* 723 F.2d 1164 (5th Cir.1984); *Bryan*, 259 Kan. 143, 910 P.2d 212. In *Coates,* the U.S. Supreme Court addressed the constitutionality of a Cincinnati, Ohio, ordinance that made it unlawful for "three or more persons to assemble . . . on any of the sidewalks . . . and there conduct themselves in a manner *annoying* to persons passing by. . . ." *Coates,* 402 U.S. at 611–12, 91 S.Ct. at 1687, 29 L.Ed.2d 214 (internal quotation marks omitted) (alteration in original) (quoting § 901–L6, Code of Ordinances of the City of Cincinnati (1956)). The Court determined the statute was unconstitutionally vague because "[c]onduct that annoys some people does not annoy others;" the ordinance does not specify a standard of conduct; and the ordinance nor the Ohio Supreme Court specified "upon whose sensitivity" a violation depends. *Coates,* 402 U.S. at 613–14, 91 S.Ct. at 1688, 29 L.Ed.2d 214. The Maryland statute is distinguishable because it proscribes a course of conduct and requires specific intent on the part of the defendant, discussed *infra. Cf. Caldwell v. State*, 26 Md.App. 94, 337 A.2d 476 (1975).

Moreover, the force of *Coates,* as far as its view of "annoying conduct," has been put in doubt subsequently. *See Colten v. Kentucky*, 407 U.S. 104, 92 S.Ct. 1953, 32 L.Ed.2d 584 (1972) (upholding a disorderly conduct statute making it criminal to congregate in a public place with the intent to annoy); *see also* M. Katherine Boychuk, *Are Stalking Laws Unconstitutionally Vague or Overbroad?,* 88 N.W. U.L.REV. 769, 785 & n. 90 (1994) (maintaining that in *Coates,* "the Court's vagueness and over breadth analyzes are so intertwined that it is difficult to extricate an absolute rule regarding the constitutional vagueness of an 'annoying conduct' standard"). We in no way suggest, as the Dissent would have one believe, that the *"holdings* of Coates v. Cincinnati* were 'put in doubt.' " Dissent, op. at 679–680, n. 11(emphasis added). The word "holding," as the Dissent employs it, sweeps broader than the Majority's observation regarding the Court's "view" on a subject.

that it is unconstitutionally vague; the finder of fact is left without an objective standard by which to examine, and anyone subject to the law is deprived of an objective standard by which to determine, what the crime of stalking constitutes.[17] *Bryan*, 910 P.2d at 220–21. It appears that the Kansas court did not consider reading into the statute a reasonable person standard. We easily set apart our statute from that of the Kansas statute. The Maryland statute does not employ the word "reasonable" with some terms, but not others, in the same manner as the Kansas statute [18] and contains further limiting provisions, discussed *infra.*

Petitioner incorrectly relies on the Fifth Circuit case, *Kramer v. Price*, 712 F.2d 174 (5th Cir.1983), *vacated*, 723 F.2d 1164 (5th Cir.1984) (per curiam),[19] which actually bolsters the use of

---

**17.** Since the present case has been heard, the Supreme Court of Kansas held that its most recent stalking statute, KAN. STAT. ANN § 21–3438 (2000), was neither unconstitutionally vague nor overbroad. *Kansas v. Whitesell*, 270 Kan. 259, 13 P.3d 887 (2000). The court's reasoning will be discussed at length *infra*.

**18.** The Kansas statute uses the word "reasonable" in relation to course of conduct, but not with regard to "following." *See supra* note 15. Section 123 does not use the word "reasonable" in defining "course of conduct" or "following," but does use it in subsection (c)(2) requiring a "reasonable warning or request to desist."

**19.** In *Kramer v. Price*, 723 F.2d 1164 (5th 1984) (per curiam), the Fifth Circuit Court of Appeals stated:

After the panel decision in this case, reported at 712 F.2d 174 (5th Cir.1983), was vacated by our grant of rehearing en banc, the Texas statute at issue was repealed and replaced by another differing from it in many respects-one that appears would not bear on Kramer's conduct which resulted in her conviction. We are aware of no other case involving the constitutionality of the earlier, now repealed statute. In view, therefore, of the limited scope of action remaining open to us after this development, we affirm the judgment of the district court but without approving or adopting its rationale.

*Price*, 712 F.2d 174, still has some precedential value, however, as the amended statute does not apply to an offense committed before the effective date of the Act, "and the former law is continued in effect for that purpose." *May v. Texas*, 765 S.W.2d 438, 440 (Tex.Crim.App. 1989). The Court of Criminal Appeals of Texas applied the reasoning in *Price*, 712 F.2d 174, to concluded that the "inherent vagueness of the

a judicial gloss of a reasonable person standard to rescue a statute from threatened unconstitutionality. Moreover, the Texas harassment statute, which the decision examines, is worded quite differently from Maryland's statute, except that both use the words "annoy" and "alarm."[20] In *Kramer*, the Fifth Circuit, in a habeas corpus proceeding, affirmed a federal district court's holding that the Texas harassment statute was unconstitutionally vague on its face after the Texas Court of Criminal Appeals, *Kramer v. Texas*, 605 S.W.2d 861 (Tex. Cr.App.1980) (en banc), affirmed Kramer's conviction under the statute. *Kramer*, 712 F.2d at 175. Relying on *Coates*, *supra* note 16, the Fifth Circuit found the statute unconstitutionally vague because neither the statute nor the court's construction of it provided a standard of conduct or indicated whose sensibilities must be offended. The court stated: "The Texas courts have made no attempt to construe the terms 'annoy' and 'alarm' in a manner which lessens their inherent vagueness. Of greater importance, the Texas courts have refused to construe the statute to indicate whose sensibilities must be offended."[21] *Kramer*, 712 F.2d at 178 (footnotes omitted) (citing *Kramer*, 605 S.W.2d 861; *Collection Consultants, Inc. v. Texas*, 556 S.W.2d 787 (Tex.Cr.App.1977)).

The Fifth Circuit identified as a difficulty that the "Texas court refused to narrow the statute by, for example, holding that it applies to writings which would annoy the

---

statute as it then existed . . . causes it to be unconstitutionally vague." *Id.*

**20.** The Texas statute in question states "a person commits an offense if he intentionally . . . communicates by telephone or in writing in vulgar, profane, obscene, or indecent language or in a coarse and offensive manner and by this action intentionally, knowingly, or recklessly *annoys* or *alarms* the recipient. . . ." *Kramer*, 712 F.2d at 175 (emphasis added) (quoting Tex. Penal Code Ann. § 42.07(a)(1)).

**21.** In support, the Fifth Circuit cited *Chaplinsky v. New Hampshire*, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942), which upheld a statute that "punished 'offensive, derisive or annoying' words because the state court had construed the statute to apply to words that 'have a direct tendency to cause acts of violence by the persons to whom, individually, the remark is addressed.' " *Kramer*, 712 F.2d at 178 n. 5.

*hypothetical reasonable person* and that its standard does not vary with the sensitivity of each complainant." *Kramer,* 712 F.2d at 178 n. 6. The court continued that it could not limit the construction of a statute on appeal when an accused is tried and convicted under a broad construction of the statute. *Id.* (relying upon *Ashton v. Kentucky,* 384 U.S. 195, 86 S.Ct. 1407, 16 L.Ed.2d 469 (1966)). In the present case, we narrow the construction of the statute by application of a reasonable person standard to save it from possible unconstitutional vagueness. Petitioner also notes that in *Kramer* the Fifth Circuit stated that the intent requirement—intent to annoy— does not "save" the statute from vagueness "because the conduct which must be motivated by intent, as well as the standard by which that conduct is to be assessed, remain vague." *Kramer,* 712 F.2d at 178. We agree that a specific intent requirement alone does not "save" a statute, but we have declared that it is helpful in "reliev[ing] the statute of the objection that it punishes without warning an offense of which the accused was unaware." *Williams,* 329 Md. at 9, 616 A.2d at 1279 (internal quotation marks omitted) (alterations in original) (quoting *Screws v. United States,* 325 U.S. 91, 101–02, 65 S.Ct. 1031, 1035, 89 L.Ed. 1495 (1945) (plurality opinion)). In addition, as discussed *infra,* neither the conduct motivated by the intent nor the standard applied to Maryland's statute remains constitutionally vague after applying a narrower construction as we have.

Petitioner also relies on *Oregon v. Sanderson,* 33 Or.App. 173, 575 P.2d 1025 (1978), *overruled in part, Oregon v. Schwartz,* 173 Or.App. 301, 21 P.3d 1128, 1134 (2001), in which the Court of Appeals of Oregon declared that state's harassment statute unconstitutionally vague. The statute provided that "[a] person commits the crime of harassment if, with intent to harass, annoy or alarm another person, he ... [e]ngages in a course of conduct that alarms or seriously annoys another person and which serves no legitimate purpose." *Sanderson,* 575 P.2d at 1026 (quoting OR.REV.STAT. § 166.065(1)(d)). The Oregon court had particular difficulty with the phrase "alarms or seriously annoys" because it "gives

no basis to distinguish between anti-social conduct which was intended to be prohibited and socially tolerable conduct which could not reasonably have been intended to be subject to criminal sanction."[22] *Sanderson,* 575 P.2d at 1027. The *Sanderson* court refused to apply a limiting construction because it decided that such a limiting judicial construction is only possible "if the underlying purpose of the statute is apparent from the statute's prior judicial interpretation or legislative history," *id.,* and that, in this instance, the statute was enacted too recently to have acquired a "judicial gloss" and that the "legislative history indicates an intention to create a catchall offense." *Sanderson,* 575 P.2d at 1028. We reach the opposite conclusion with regard to § 123 because, although its legislative history does not dictate how the phraseology came about, that history does provide insight into the legislative purpose, whereas the Oregon court determined that its statute's legislative history intended to enact a catchall provision—"a dragnet provision . . . to reach myriad forms of harassment that cannot be specifically enumerated." *Id.* (internal quotation marks omitted) (alteration in original) (citation omitted).

Furthermore, the Court of Appeals of Oregon in *Oregon v. Schwartz,* 173 Or.App. 301, 21 P.3d 1128, 1134 (Ct.App.2001), expressly "repudiated" the quote in *Sanderson* that the "fundamental flaw of the statute at issue" is that "it gave no basis to distinguish between anti-social conduct which was intended to be prohibited and socially tolerable conduct which could not reasonably have been intended to be subject to criminal action." *Schwartz,* 21 P.3d at 1134 (internal quotation marks

---

**22.** Petitioner also discusses how the Court of Appeals of Washington adopted the reasoning in *Oregon v. Sanderson,* 33 Or.App. 173, 575 P.2d 1025 (1978), to find a municipal code's harassment provision unconstitutionally vague because the code provided no clear guidelines for enforcement and did "not draw a reasonably clear line between the kind of annoying conduct which is criminal and that which is not." *City of Everett v. Moore,* 37 Wash.App. 862, 683 P.2d 617 (1984). We distinguish the Washington case for the same reasons that we distinguish the Oregon case, *supra.*

omitted) (quoting *Sanderson,* 575 P.2d at 1027). The court reasoned in *Schwartz:*

> [A]n argument that a statute covers too much ground can never, standing alone, support a vagueness challenge. As a matter of logic, the conclusion that a law is insufficiently definite to provide guidance to its potential violators and enforcers simply does not follow from the premise that the statute criminalizes too broad a category of conduct. Secondly, such an argument cannot provide the bases for an overbreadth claim, because "[a] legislature can make a law as 'broad' and inclusive as it chooses unless it reaches into constitutionally protected ground." ... The sole limit on a statute's breadth is constitutionality, not our second-guessing of what the legislature could or could not have deemed "socially tolerable."

*Schwartz,* 21 P.3d at 1134 (second alteration in original) (citation omitted).

### ii. Maryland's Harassment Statute Survives Vagueness Analysis

Whether § 123 should be tested for vagueness on its face is immaterial; § 123 survives the void-for-vagueness doctrine whether it is scrutinized using the agreed facts of the present case alone or employing the imagined facts of "marginal cases." The statute, on its face and as applied to the facts of Galloway's case, provides fair warning to potential offenders and adequate guidelines to enforcement authorities when the judicial gloss of a reasonable person standard is read into the statute, along with the inherent restrictions in the statute and the requirement of specific intent.

We agree with the reasoning of the Court of Special Appeals in *Caldwell v. State, supra,* and with those states finding that the terms "annoy," "alarm," and "harass" are commonly understood by ordinary people and, as such, provide fair notice to potential offenders and adequate guidance for enforcement. The definition of "annoy" is "to disturb or irritate especially by repeated acts." MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 47 (10th ed.1993). An alternative definition for

annoy is "to *harass* especially by quick brief attacks."[23] *Id.* (emphasis added). The definition of alarm is "to strike with fear."[24] *Id.* at 26. The applicable definition of harass is "to annoy persistently."[25] *Id.* at 529. These definitions are sufficient to qualify as common and generally accepted meanings; they "comport with everyday understandings of the words they define" and are "as plain to law enforcement

---

**23.** The Court of Appeal of California, determining that a stalking statute, which includes a definition of "harasses" that employs the word "annoy," was not unconstitutionally vague, noted that "annoy" is the most "subjective and least serious" of the challenged words, but that "the word given its context ... is 'sufficiently certain to inform persons of ordinary intelligence of the nature of the offense which is prohibited.'" *People v. Ewing,* 76 Cal.App.4th 199, 90 Cal.Rptr.2d 177, 183 (1999) (quoting *Smith v. Peterson,* 131 Cal.App.2d 241, 280 P.2d 522 (1955)), *reh'g denied,* 76 Cal.App. 4th 1060a (App. 4th Dist.1999). Relying on an 1887 English opinion, *Tod Heatly v. Benham,* 40 Ch.D. 90, 94 (1887), the court continued, stressing a reasonable understanding of the word "annoy":

> That case involved a covenant of a lease that the lessee would not do on the leased premises anything which might grow to the *annoyance,* nuisance, grievance, or damage of the lessor or the inhabitants of adjoining houses. Construing this part of the Lease, Lord Justice Cotton said: The [judges] must decide not upon what their own individual thoughts are, but on what, in their opinion and upon the evidence before them, would be an annoyance or grievance to reasonable, sensible people; ... It is not sufficient in order to bring the case within the words of the covenant, for the plaintiffs to show that a particular man objects to what is done, but we must be satisfied by argument and by evidence, that *reasonable people,* having regard to the ordinary use of a house for pleasurable enjoyment, would be annoyed or aggrieved by what is being done.

*Ewing,* 90 Cal.Rptr.2d at 183 (alterations in original) (emphasis added) (internal quotation marks omitted).

**24.** The other definition of the verb form of alarm is "to give warning to." Merriam Webster's Collegiate Dictionary 26 (10th ed.1993). It is obvious that this definition of "alarm" and the other definition of "harass," *infra* note 25, are not meant to be applied in § 123, which is intended to penalize harassment. *See Williams,* 329 Md. at 15, 616 A.2d at 1282 ("In looking to the language of a statute ... we read the words 'in light of the full context in which they appear, and in light of external manifestations of intent or general purpose available through other evidence.'") (quoting *Privette v. State,* 320 Md. 738, 744, 580 A.2d 188 (1990)).

**25.** The other definition of "harass" is "to worry and impede by repeated raids." *Id.* at 529.

officials as to the general public." *Williams,* 329 Md. at 11, 616 A.2d at 1280; *see also People v. Ewing,* 76 Cal.App.4th 199, 90 Cal.Rptr.2d 177, 183–84 (1999) (determining that California's similarly worded statute's definition of "harasses" "establishes a standard of conduct which is ascertainable by persons of ordinary intelligence" because "[t]he language 'conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices' " (quoting *United States v. Petrillo,* 332 U.S. 1, 8, 67 S.Ct. 1538, 1542, 91 L.Ed. 1877 (1947))), *reh'g denied,* 76 Cal.App. 4th 1060 (App. 4th Dist.1999).

We have discussed the intent requirement—"with intent to *harass, alarm,* or *annoy* the other person"—and have determined, without difficulty in applying these terms, that certain factual determinations in a protective order provided evidence of intent as required by § 123. We acknowledged that inclusion in the protective order that the defendant "threaten[ed] to harm" the victim provides some evidence of intent which must be proven as an element of § 123. *Streater,* 352 Md. at 816, 724 A.2d at 119. We further stated that "[t]he battery or assault and battery referred to in the protective order also may have special relevance to the intent element[ ] . . . of the harassment . . . charge[ ]." *Id.*

Other jurisdictions have also determined that the words "alarm" and "annoy" have commonly understood meanings and definiteness.[26] For instance, In *Ewing,* 76 Cal.App.4th 199, 90 Cal.Rptr.2d 177, the California appellate court deter-

---

**26.** Employing the words "alarm" and "annoy" serves another important purpose in the statute. It has been noted that "[t]he harm which the offender inflicts upon the victim should be as broadly worded as possible" so as to include "those victims who may be distressed or angry." Carol E. Jordan, et al., *Stalking: Cultural, Clinical, and Legal Considerations,* 38 BRANDEIS L.J. 513, 578 (2000). It has been noted that the same is true with harassment; "harassment warrants multiple legal sanctions that respond to the differences among perpetrators and victims." Note, *A Remedial Approach to Harassment,* 70 VA. L.REV. 507, 508 (1984). A flexible legal response to harassment is warranted because (1) "[t]he diversity of harassers matches the variety of their methods" and (2) "[t]he attitudes of harassment victims, like the perpetrators and their methods, are not easily pigeonholed." *Id.* at 513.

mined that its stalking statute was not unconstitutionally vague.[27] In so doing, the court first analyzed, among others, the terms "alarms" and "annoys" and concluded that these words have "a clear and understandable dictionary definition." *Ewing*, 90 Cal.Rptr.2d at 182. The Court of Appeals of Kentucky determined that the use of the words "alarms" and "annoys" to define "stalk" in the Kentucky stalking statute did not render the statute unconstitutionally vague because the statute, taken as a whole, had "sufficient *definiteness* that ordinary people can determine what conduct is prohibited." *Monhollen v. Kentucky*, 947 S.W.2d 61, 62 (Ky.App.1997) (emphasis added) (discussing KEN.REV.STAT. ANN. § 508.130). The Supreme Court of Montana determined that the presence of the word "annoy" in that state's harassment statute did not cause the statute to be unconstitutionally vague because "annoy" has a "commonly understood meaning[ ]" and is readily understood so that "a reasonable person of average intelligence would comprehend . . . [its] meaning." *Montana v. Nye*, 283 Mont. 505, 943 P.2d 96, 101–02 (1997) (discussing MONT.CODE ANN. § 45-5-221).

As demonstrated in the above discussion, not all reviewing courts have felt comfortable that there is a common understanding as to the meaning of the words "annoy," "alarm," and "harass." It is often argued, as it was at oral argument in the present case, that these words are broad enough to cover telephone calls from creditors, as well as the actions of a street performer. *See, e.g., Norman*, 703 P.2d at 1267. Clearly the statute was not intended to cover such actions. *See supra* pp. 612–613 (discussing the legislative purpose of § 123). *Cf. Coates*, 402 U.S. at 618, 91 S.Ct. at 1689, 29 L.Ed.2d 214 (White, J., dissenting) ("Any man of average

---

**27.** The statute in question included the following definition of "harass": "a knowing and willful course of conduct directed at a specific person that *seriously alarms, annoys,* torments, or terrorizes the person, and that severs no *legitimate purpose.*" *Ewing*, 90 Cal.Rptr.2d at 181 (emphasis added) (quoting CAL. PENAL CODE § 646.9). Though the California statute addressed stalking and § 123 is aimed at harassment, the California statute's definition of "harass" is instructive.

comprehension should know that some kinds of conduct, such as assault or blocking passage on the street, will annoy others and are clearly covered by the 'annoying conduct' standard.... It would be frivolous to say that these and many other kinds of conduct are not within the foreseeable reach of the law."). Section 123 of the Maryland statute, like the California statute, has provisions that sufficiently limit the conduct covered. In addition, we read a reasonable person standard into the statute to narrow further its construction to ensure that § 123 is not applied to such situations as creditor telephone calls and street performances.

Section 123 contains the provision "[a]fter *reasonable* warning or request to desist by or on behalf of the other person." (Emphasis added). *See supra* p. 609. We have held that such a warning ensures that the offender is aware that further conduct will "alarm[ ] or seriously annoy[ ]" the "other person," and as such, the offender has fair notice that he or she may be subject to prosecution. *Eanes,* 318 Md. at 463, 569 A.2d at 617 (citing *Bacheller v. State,* 3 Md.App. 626, 634–35, 240 A.2d 623, 628 (1968), *rev'd on other grounds,* 397 U.S. 564, 90 S.Ct. 1312, 25 L.Ed.2d 570 (1970); *see also United States v. Occhino,* 629 F.2d 561, 563 (8th Cir.1980) (per curiam), *cert. denied,* 450 U.S. 968, 101 S.Ct. 1487, 67 L.Ed.2d 618 (1981); *Pennsylvania v. Weiner,* 230 Pa.Super. 245, 326 A.2d 896, 898 (1974)). Requiring repeated conduct before a violation occurs has been found by other courts to mitigate against vagueness.[28] *See United States v. Smith,* 685 A.2d 380, 387 (D.C. 1996) (declaring that the requirement of "repeatedly" in D.C.'s stalking statute helps to "mitigate any potential vagueness problems"), *cert. denied,* 522 U.S. 856, 118 S.Ct. 152, 139 L.Ed.2d 98 (1997); *Johnson v. Indiana,* 648 N.E.2d 666, 670

---

**28.** Requiring that a request to desist be delivered may have an even more important function. One author has noted that requiring a request that the defendant stop contact "may function as a constructive supplement to the statute, since it provides for a mechanism by which the victim's voice can be heard, in contrast to much of the law on sexual assault and domestic violence, which far too often negates the victim's voice." Jordan, *supra* note 27, at 577.

(Ind.Ct.App.1995) (determining that because "the State must prove engagement in a repeated or continuing course of conduct militates against arbitrary enforcement" of Indiana's stalking statute). In addition to requiring a reasonable warning to desist, § 123(a) also defines "course of conduct" by requiring "a persistent pattern of conduct, composed of a series of acts over a period of time." Thus, § 123 has two separate provisions requiring repeated acts, helping to buffer against potential vagueness.

Additionally, § 123 has a specific intent requirement— "[w]ith intent to harass, alarm, or annoy the other person." We repeatedly have determined that such a requirement, while it may not be able alone to save a statute from constitutional infirmity, can help in avoidance of a legally factual conclusion.[29] *See, e.g., Williams,* 329 Md. at 9, 616 A.2d at 1279; *see also Caldwell,* 26 Md.App. at 103–04, 337 A.2d at 481–82. A specific intent requirement "can ameliorate vagueness problems" because "[i]f an actor has specific intent to

---

**29.** Respondent aptly points out that "other courts have upheld harassment statutes against a vagueness challenge where the statute requires a specific intent to harass or alarm another person." Petitioner's Br. at 11; *cf.* Jordan, *supra* note 27, at 564 (noting that many courts have determined that a specific intent requirement in stalking statutes "saves them from any vagueness problems"). In *United States v. Smith,* 685 A.2d 380, 386 (D.C.1996), *cert. denied,* 522 U.S. 856, 118 S.Ct. 152, 139 L.Ed.2d 98 (1997), the District of Columbia Court of Appeals determined that the intent requirement in its stalking statute narrows the statute's application and helps to "define the offense so ordinary people can understand what conduct is prohibited, and also discourage arbitrary enforcement of the statute." In *Idaho v. Richards,* 127 Idaho 31, 896 P.2d 357, 365 n. 3 (Ct.App.1995), the Court of Appeals of Idaho discussed how the intent requirement in its telephone harassment statute distinguished it from *Coates v. Cincinnati, supra* note 16, and ensures that "the statute's application is ... not dependent upon the sensibilities or vulnerability of another person." In *New Jersey v. Saunders,* 302 N.J.Super. 509, 695 A.2d 722, 728 (1997), the Superior Court of New Jersey concluded that the "contention that the stalking statute is vague fails because the statute requires a specific intent." In *Pennsylvania v. Hendrickson,* 555 Pa. 277, 724 A.2d 315, 319 (1999) the Supreme Court of Pennsylvania stated that vagueness challenges fail when a statute has a specific intent requirement because a defendant cannot complain he did not understand the crime he has been found to have had the specific intent of doing.

bring about a particular effect, he can be presumed to be on notice that his actions to effect that intent constitute a crime." Boychuk, *supra,* at 781; *Caldwell,* 26 Md.App. at 104, 337 A.2d at 482 (noting that "a person already bent on serious wrongdoing has less need for notice and that a citizen who refrains from acting with morally bad intent is not endangered by the statutory sanction" (internal quotation marks omitted) (citation omitted)). In *Caldwell,* the Court of Special Appeals explained that "[b]y requiring such specific intent the legislature has sufficiently delineated in a constitutional sense, what is criminal conduct under the statute so that the citizens of Maryland need not engage in a guessing game as to their criminal liability...." *Caldwell,* 26 Md.App. at 105, 337 A.2d at 483.

The U.S. Supreme Court recognizes that a specific intent requirement aids in ensuring that an accused has fair notice that he or she is violating a criminal statute. In *Screws v. United States,* the U.S. Supreme Court stated:

> The Court, indeed, has recognized that the requirement of a specific intent to do a prohibited act may avoid those consequences to the accused which may otherwise render a vague or indefinite statute invalid. The constitutional vice in such a statute is the essential injustice to the accused of placing him on trial for an offense, the nature of which the statute does not define and hence of which it gives no warning. But where the punishment imposed is only for an act knowingly done with the purpose of doing that which the statute prohibits, the accused cannot be said to suffer from lack of warning or knowledge that the act which he does in violation of law.

325 U.S. at 101–02, 65 S.Ct. at 1035–36, 89 L.Ed. 1495 (citations omitted). More recently, the U.S. Supreme Court determined that the presence of a scienter requirement in a statute "ameliorated" the concern that the statute was unconstitutionally vague because it ensured that "people of ordinary intelligence [have] a reasonable opportunity to understand what conduct ... [the statute] prohibits." *Hill v. Colorado,*

530 U.S. 703, 732, 120 S.Ct. 2480, 2498, 147 L.Ed.2d 597 (2000).

 Reading a reasonable person standard into § 123 helps to narrow further the construction of the statute, keeping in mind that a statute "does not become unconstitutionally vague merely because it may not be perfectly clear at the margins." *Williams,* 329 Md. at 11, 616 A.2d at 1280. In other words, "the vagueness doctrine does not require absolute precision or perfection." *Williams,* 329 Md. at 13, 616 A.2d at 1280–81 (citing *United States v. Powell,* 423 U.S. 87, 94, 96 S.Ct. 316, 321, 46 L.Ed.2d 228 (1975)). As noted, "to avoid serious constitutional issues, this Court has repeatedly given a narrow construction to statutes containing broad general language." *Schochet,* 320 Md. at 729–31, 580 A.2d at 183–84 (providing as examples such cases as *In re James D.,* 295 Md. 314, 455 A.2d 966 (1983), and *Wilson v. Bd. of Sup. of Elections,* 273 Md. 296, 328 A.2d 305 (1974)). We have stated "[t]he objective 'reasonable' test is used in many areas of the law as an appropriate determinant of liability and thus a guide to conduct." *Eanes,* 318 Md. at 461–62, 569 A.2d at 615–16.

The California appellate court similarly factored in a reasonable person standard in California's stalking statute to aid in narrowing its construction.[30] *Ewing,* 90 Cal.Rptr.2d at 182. California demonstrated, using brackets as a visual aid to indicate those words that the court read into the statute, how the statute's definition of "harass" would read. According to the court, "[t]he statutory definition of 'harasses' becomes 'a knowing and willful course of conduct directed at a specific person that [a *reasonable person would consider* as] *seriously*

---

**30.** The Court of Appeals of Indiana has also read a reasonable person standard into a harassment statute and thus saved it from being considered unconstitutionally vague. The court stated that even though the language of the statute did not contain a reasonable person standard, "[t]he standard to be used is that of a reasonable man and, using that standard, the statute and the relevant words have an ascertainable meaning." *Kinney v. Indiana,* 404 N.E.2d 49, 50 (Ind.Ct.App.1980); *see also* Boychuk, *supra* note 16, at 786–87; Jordan, *supra* note 27, at 564 (discussing the importance of a reasonable person standard in saving stalking statutes from constitutional infirmity).

*alarm[ing]*, *[seriously]* *annoy[ing]*, *[seriously]* *torment[ing]*, *or [seriously] terrorizes*, the person' against whom it is directed." *Id.* (alterations in original) (emphasis in original) (quoting CAL.PENAL CODE § 649.9(e)).

Moreover, unlike *Oregon v. Sanderson*, discussed *supra*, in which the Oregon court determined that it would not read in a reasonable person standard because the legislative history indicated an intention to create a catchall offense, the legislative history of § 123 supports a contrary tact.[31] As demonstrated *supra* in the *Summary of Committee Report*, the purpose of the harassment statute is "to help law enforcement agencies in their attempts to defuse *ongoing feuds and longstanding disputes*," to help "avoid *extreme situations*," and to provide relief for victims of harassment who without this statute would be left without a means of legal redress. *Summary of Comm. Rep. on H.B. 381*, at 1–2; *cf. supra* note

---

**31.** The Oregon court also had difficulty applying a reasonable person standard because the purpose of the statute could not be determined. *Oregon v. Sanderson*, 33 Or.App. 173, 575 P.2d 1025, 1027 (1978). We have not addressed previously the constitutionality of § 123, but have discussed its application; similarly, as the trial judge in the present case discussed, the Court of Special Appeals, though also not addressing previously the constitutionality of § 123 or those subsections under scrutiny in the present case, has discussed its application of the statute with regard to the warning requirement in subsection (c)(2), the definition of "course of conduct" in subsection (c). In *Streater v. State*, the Court of Special Appeals determined, in a case in which the defendant was convicted of harassment, that the existence of a protective order was relevant in light of the requirement in subsection (c)(2) of § 123 that there be a "reasonable warning or request to desist." *Streater v. State*, 119 Md.App. 267, 272–73, 704 A.2d 541, 543–44 (1998), *rev'd on other grounds*, 352 Md. 800, 724 A.2d 111 (1999). In *Streater v. State*, 352 Md. 800, 724 A.2d 111, we acknowledged that certain factual determinations in a protective order provided evidence of course of conduct, intent, and "malicious[ ] engage[ment] in a course of conduct that alarms or seriously annoys another person." 352 Md. at 816–17, 724 A.2d at 119. In *Pall v. State*, the Court of Special Appeals determined that a reasonable warning in subsection (c)(2) "is one in which the defendant knows or has reason to know that his conduct is unwanted and is warned to stop" and that under § 123, "there is no question that the criminal act can only occur after a reasonable warning was given." *Pall v. State*, 117 Md.App. 242, 248, 250, 699 A.2d 565, 567–68 (1997).

26 (discussing the need for flexible harassment statutes to ensure that victims of harassment are provided with proper redress). The Governor's Task Force on Violence and Extremism supported the enactment of H.B. 381 because it felt that such a statute "may assist the citizens in our State who are victims of harassment based on their racial, religious or ethnic background." Letter from Constance Ross Beims, Chairperson, Governor's Task Force on Violence and Extremism, to The Honorable Joseph E. Owens, Chairperson, House Judiciary Committee 3 (27 January 1986) (on file with State Library). It follows that § 123 was in no way intended to cover such situations as repeated phone calls from creditors. Employing a reasonable person standard further ensures that the § 123 is limited to its intended purposes.

The last aspect of Petitioner's vagueness argument is whether "without *legal* purpose" is constitutionally adequate. The courts have come down on either side of the fence regarding the issue of whether "without *legitimate* purpose" is unconstitutionally vague. *Compare Oregon v. Norris–Romine*, 134 Or.App. 204, 894 P.2d 1221 (1995) (concluding the phrase "legitimate purpose" was unconstitutionally vague), *review denied*, 321 Or. 512, 900 P.2d 509 (1995), *with Kansas v. Rucker*, 267 Kan. 816, 987 P.2d 1080, 1094–95 (1999) (finding that the term "legitimate purpose" "when read in conjunction with the rest of the statutory language do[es] not require that a person of common intelligence guess as to their meanings"). We follow the latter line of cases, noting that the word "legal" is more definite and clear than "legitimate." [32] "Legal" de-

---

32. In *Papachristou v. City of Jacksonville*, 405 U.S. 156, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972), the U.S. Supreme Court determined that a vagrancy law was unconstitutionally vague, in part, because the qualification " 'without any *lawful* purpose or object' may be a trap for innocent acts." *Papachristou*, 405 U.S. at 162, 92 S.Ct. at 844, 31 L.Ed.2d 110 (quoting Jacksonville, Florida, Ordinance Code 26–57). The difference between § 123 and the Florida loitering statute is that § 123 requires more than just acting without a lawful purpose; § 123 also requires specific intent and a reasonable warning or a request to desist. *Cf.* Boychuk, *supra* note 16, at 791 (stating that the difference between the loitering laws and the present day stalking laws, particularly that of

rives from or is found in law, as opposed to "legitimate," which encompasses that which is legal and beyond. *See* MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 664–65.

As for Petitioner's argument that the statutory exemption for conduct to "express political views or provide information to others" [33] is unconstitutionally vague, it is unfounded and unsupported. This same language in either a harassment or a stalking statute has not been challenged in any other jurisdiction. The language, however, when looked at in conjunction with the rest of the statute and with the underlying purpose of the statute, has a definite and clear meaning that helps in setting the boundaries for the enforcement of § 123. *See Webster v. State*, 359 Md. 465, 480, 754 A.2d 1004, 1012 (2000) (stating that if a statute is clouded by ambiguity or obscurity, it is necessary not only to consider the literal and usual meaning of the words, but their meaning in light of setting, objectives, and purpose of enactment); *Gargliano v. State*, 334 Md. 428, 436, 639 A.2d 675, 678 (1994) (same); *Williams*, 329 Md. at 15–16, 616 A.2d at 1282 (We must discern "legislative intent from the entire statutory scheme, as opposed to scrutinizing parts of the statute in isolation."); *see also Randall Book Corp. v. State*, 316 Md. 315, 327, 558 A.2d 715, 721 (1989) ("[I]n addition to considering the specific words of the statute, we may consider the general history and prevailing mood of the legislative body with respect to the type of criminal conduct involved."). It is apparent that this language was included in the statute to help in avoiding application of the statute to such situations as, but not limited to, protected political and religious leafleting, commercial solicitations, and

---

California, is that "the loitering statutes permit arrest solely on the basis of a person's answers to questions posed by the police"—"just conduct without a legitimate purpose"—while present day statutes "also require the act of following or harassing ... [and] an intent to do harm").

**33.** This same language appears in Md.Code (1957, 1996 Repl.Vol., 2000 Cum.Supp.), Art. 27 § 55C, which concerns the prohibitions and penalties regarding electronic mail. The constitutionality of the language in § 555C has not been questioned.

other types of informational leaflets or contacts such as store openings and community action programs. This language is of the same tenor as used by other jurisdictions that have stalking and harassment statutes that contain the phrase, or some variation of, "does not include constitutionally protected activity." Those jurisdictions have not determined that such a phrase is unconstitutionally vague. *See, e.g., Bouters v. Florida,* 659 So.2d 235 (Fla.1995) (holding Florida's stalking statute, which contained the language "[c]onstitutionally protected activity is not included" in the "course of conduct" definition and constitutional protected activity includes "picketing or other organized protests," was not impermissibly vague), *cert. denied,* 516 U.S. 894, 116 S.Ct. 245, 133 L.Ed.2d 171; *Johnson,* 648 N.E.2d at 668–69 (determining that an Indiana stalking statute specifically excluding constitutionally protected activity such as "lawful picketing pursuant to labor disputes" from its ambit was not unconstitutionally vague); *Saunders,* 695 A.2d at 722 (finding that a stalking statute, which specifically excluded "constitutionally protected activity" from the definition of "course of conduct" was not unconstitutionally vague). We conclude that the language in the Maryland statute is in no way unclear.

None of the words and phrases under scrutiny in § 123 are unconstitutionally vague. They have a common meaning and understanding known to the person of common or average intelligence. Moreover, employing a reasonable person standard and the inherent specific intent requirement alleviates further potential doubt. Finally, a potential offender does not have to be wary of unanticipated criminal liability because of the condition that there be a reasonable request to desist. In the present case, Javin, her parents, the assistant warden and psychologist at the prison, and Petitioner's former counsel told Petitioner not to send letters to Javin. Despite these warnings, Petitioner proceeded to send a large volume of additional letters to Javin within a relatively short period of time. The facts of the present case are also congruent with the intended purpose of the statute. As the Court of Special Appeals stated, "[i]t strains credulity to suggest that ... [Petitioner]

could not reasonably understand that these letters would alarm or seriously annoy a woman who [was] the victim of his prior crimes of kidnapping and stalking." *Galloway,* 130 Md.App. at 96, 744 A.2d at 1073.

## C. Overly Broad

Petitioner also is incorrect in arguing that § 123 is unconstitutionally overbroad. The U.S. Supreme Court explained that "[a] clear and precise enactment may nevertheless be 'overbroad' if in its reach it prohibits constitutionally protected conduct." *Grayned,* 408 U.S. at 114, 92 S.Ct. at 2302, 33 L.Ed.2d 222 (footnote omitted). The purpose of the over breadth doctrine "is designed to protect First Amendment freedom of expression from laws written so broadly that the fear of punishment might discourage people from taking advantage of that freedom." *Outmezguine v. State,* 335 Md. 20, 36, 641 A.2d 870, 878 (1994) (citing *Broadrick v. Oklahoma,* 413 U.S. 601, 611–13, 93 S.Ct. 2908, 2915–17, 37 L.Ed.2d 830 (1973); *Curran v. Price,* 334 Md. 149, 167, 638 A.2d 93 (1994)). As we stated in *Eanes v. State:*

> The crucial question ... is whether the [statute] sweeps within its prohibitions what may not be punished under the First and Fourteenth amendments. The concern is that an overbroad statute may, by that very fact, have a chilling effect on free expression. That is, if a statute is to be struck down as overbroad, it must appear that the statute's very existence will inhibit free expression. The doctrine is 'strong medicine' and should be applied sparingly. It should not be invoked when a limiting construction can be placed on the statute. Because the over breadth doctrine involves a challenge to the facial validity of a statute, a court should not resort to it unless there is a realistic danger that the statute itself will significantly compromise recognized first amendment protection of parties not before the court.

*Eanes,* 318 Md. at 464–65, 569 A.2d at 618 (alterations in original) (citations omitted).

The U.S. Supreme Court has applied the over breadth doctrine to a wide spectrum of cases ranging from those

statutes that regulate only the spoken word to those that involve "expressive" conduct. *Broadrick,* 413 U.S. at 613–16, 93 S.Ct. at 2916–18, 37 L.Ed.2d 830. The Court has applied a higher standard—the over breadth must be real, substantial, and judged "in relation to the statute's plainly legitimate sweep"—to those statutes that involve conduct and not merely speech:

> [T]he plain import of our cases is, at the very least, that facial over breadth adjudication is an exception to our traditional rules of practice and that its function, a limited one at the outset, attenuates as the otherwise unprotected behavior that it forbids the State to sanction moves from 'pure speech' toward conduct and that conduct—even if expressive—falls within the scope of otherwise valid criminal laws that reflect legitimate state interests in maintaining comprehensive controls over harmful, constitutionally unprotected conduct. Although such laws, if too broadly worded, may deter protected speech to some unknown extent, there comes a point where that effect—at best a prediction—cannot, with confidence, justify invalidating a statute on its face and so prohibiting a State from enforcing the statute against conduct that is admittedly within its power to proscribe.

*Broadrick,* 413 U.S. at 615–16, 93 S.Ct. at 2917–18, 37 L.Ed.2d 830.

Explained in another way:

> [P]articularly where conduct and not merely speech is involved, we believe that the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep.

*Broadrick,* 413 U.S. at 615, 93 S.Ct. at 2918, 37 L.Ed.2d 830. In contrast, when it comes to statutes that regulate only speech,[34] the Court has decided "that the possible harm to

---

34. The Court is referring to those cases "involving statutes which, by their terms, seek to regulate 'only spoken words.'" *Broadrick,* 413 U.S. at 612, 93 S.Ct. at 2916, 37 L.Ed.2d 830 (quoting *Gooding v. Wilson,* 405 U.S. 518, 520, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972)) (citing *Cohen*

society in permitting some unprotected speech to go unpublished is outweighed by the possibility that protected speech of others may be muted and perceived grievances left to fester because of the possible inhibitory effects of overly broad statutes." *Broadrick,* 413 U.S. at 612, 93 S.Ct. at 2916, 37 L.Ed.2d 830.

As with the vagueness challenge, the courts of our companion states have divided in their views regarding their respective statutes dealing with harassment as unconstitutionally overbroad or not. We conclude that the reasoning of those states that have determined that their similar harassment statutes do not transgress the confines of the over breadth doctrine are more persuasive, taking into account the mandates of the doctrine and the language of § 123. In following these states, we further determine that § 123 sanctions conduct that is within the state's power to prohibit and that any overbreadth that the statute arguably may be subject to is not substantial in relation to that conduct which § 123 is meant legitimately to prohibit (or protect).

Many states have concluded that their harassment statutes are not overbroad because of their statutory requirements for purposeful conduct, such as in the present case, requiring an "intent to harass, alarm, or annoy the other person." In *Connecticut v. Snyder,* 49 Conn.App. 617, 717 A.2d 240 (1998) the Appellate Court of Connecticut concluded that that state's harassment statute was not unconstitutionally overbroad as it applied to conduct. The statute states that a person is guilty of harassment when "with intent to harass, annoy or alarm another person, he communicates with a person by telegraph or mail, by electronically transmitting a facsimile through connection with a telephone network, by computer network ..., or by any other form of written communication, in a manner likely to cause annoyance or alarm...." *Snyder,* 717

v. *California,* 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971); *Street v. New York,* 394 U.S. 576, 89 S.Ct. 1354, 22 L.Ed.2d 572 (1969); *Brandenburg v. Ohio,* 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969); *Chaplinsky v. New Hampshire,* 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942)).

A.2d at 241 (second alteration in original) (quoting CONN. GEN.STAT. § 53a–183 (a)(2)). Relying upon *Connecticut v. Anonymous*, 34 Conn.Supp. 689, 389 A.2d 1270 (1978), the Connecticut court stated:

> The over breadth principle is not violated by the unrestricted scope of the messages which the statute may ban because it is the manner and means employed to communicate them which is the subject of the prohibition rather than their content. The statute is not flawed because a recital on the telephone of the most sublime prayer with the intention and effect of harassing the listener would fall within its ban as readily as the most scurrilous epithet. The prohibition is against purposeful harassment by means of a device readily susceptible to abuse as a constant trespasser upon our privacy.

*Snyder*, 717 A.2d at 243–44 (internal quotation marks omitted) (quoting *Anonymous*, 34 Conn.Supp. 689, 389 A.2d 1270). The *Snyder* court further acknowledged thusly with respect to mailings, such as in the present case:

> Since the statute proscribes conduct, rather than content of the mailings, the risk that the statute will chill people from the exercise of free speech is minor compared with the unfortunately prevalent misuse of the postal system to harass others and invade their privacy. Thus, because this statute prohibits intentional harassment by means of the mail and does not seek to regulate the content of such mailings, we hold that first amendment freedoms are not involved and the statute is not unconstitutionally overbroad.

*Snyder*, 717 A.2d at 244.

Similarly, in *People v. Taravella*, 133 Mich.App. 515, 350 N.W.2d 780 (1984), the Court of Appeals of Michigan determined that Michigan's telephone harassment statute prohibited conduct rather than pure speech and, as such, was not unconstitutionally overbroad. The Michigan court stated:

> Do telephone calls by an angry parent to a student with failing grades, by a dissatisfied consumer or by a disgruntled constituent, if accompanied by language thought to be

'offensive' by the recipient of the call, subject the caller to criminal sanctions under the statute? In each case, defendant claims, the caller's exercise of his constitutional right of free speech might 'annoy,' 'frighten' or be considered 'obscene' or 'harassing' by the listener. Thus, under defendant's interpretation of the statute, if is the listener's perception or characterization of the nature of the call which would control. We disagree. The statute clearly provides that the focus is on the caller; *it is the malicious intent with which the transmission is made that establishes the criminality of the conduct.*

*Taravella,* 350 N.W.2d at 784 (emphasis added).

On the same note,[35] in *Idaho v. Richards,* 127 Idaho 31, 896 P.2d 357 (Ct.App.1995), the Court of Appeals of Idaho determined that a harassment statute is not overly broad because the statute prohibited "only telephone contacts made with a specific and exclusive *intent* to 'annoy, terrify, threaten, intimidate, harass or offend,' " which is not protected speech but conduct, and the statute did not proscribe telephone calls made "with a legitimate intent to communicate." *Richards,* 896 P.2d at 362 (emphasis added). The court, quoting from the U.S. Court of Appeals for the Fourth Circuit, stated:

The government has a strong and legitimate interest in preventing the harassment of individuals.... 'Prohibiting harassment is not prohibiting speech, because harassment is not a protected speech. Harassment is not communication, although it may take the form of speech. The statute

---

**35.** The Supreme Court of Pennsylvania also concluded that state's harassment statute was not unconstitutionally broad because

[t]he government has a legitimate interest in preventing the harassment of individuals. The statute is not directed at the content of speech and is unrelated to the suppression of free expression. Rather the statute focuses on the manner and means of communication and proscribes communications made with an *intent* to harass. By requiring an intent to harass, the statute does not punish constitutionally-protected conduct and under the principles espoused in *Broadrick,* the statute is not facially overbroad in relation to its legitimate purpose.

*Hendrickson,* 724 A.2d at 318 (emphasis added).

prohibits only telephone calls made with the intent to harass. Phone calls made with the intent to communicate are not prohibited. Harassment in this case, thus is not protected merely because it is accomplished using a telephone.' [36]

*Id.* (quoting *Thorne v. Bailey,* 846 F.2d 241, 242 (4th Cir.1988) (quoting *West Virginia v. Thorne,* 175 W.Va. 452, 333 S.E.2d 817, 819 (1985), *cert denied,* 474 U.S. 996, 106 S.Ct. 413, 88 L.Ed.2d 363 (1985))); *see also Champagne v. Gintick,* 871 F.Supp. 1527 (D.Conn.1994) ("[T]he Supreme Court has held that 'violence or other types of potentially expressive activities that produce special harms distinct from their communicative impact . . . are entitled to no constitutional protection.'" (alteration in original) (quoting *Tinker v. Des Moines Independent Community Sch. Dist.,* 393 U.S. 503, 513, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); *Roberts v. United States Jaycees,* 468 U.S. 609, 628, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984))). In the present case, conduct that otherwise qualifies as unlawful harassment is not protected merely because it came to Javin's or her parents' home in the form of letters delivered through the United States Postal Service.

Furthermore, § 123 expressly eliminates constitutionally protected speech from its ambit. Section 123 "does not apply to any peaceable activity intended to express political views or provide information to others" and the conduct to be prohibited must have no "legal purpose." Other states have concluded that similar restrictive language helps to abate any over breadth. *Cf.* Boychuk, *supra,* at 788 (suggesting that employing language in stalking and harassment statutes that "specifically except[s] protected activities from the scope of the

---

**36.** The Dissent appears to overlook this concept in its criticism of the Majority: "How does a court conclude that the sending of letters is without a legal purpose, or is not the expression of political views, or is not the providing of information, without looking at the content of the letters?" Dissent, op. at 669. Of course, the content must be examined, but when the content reveals that which is harassment (more specifically the intent to harass, alarm, or annoy), it no longer falls under protected speech.

statute" would aid in ensuring that such statutes do not "infring[e] on legitimate activities"). In *People v. Shack*, 86 N.Y.2d 529, 634 N.Y.S.2d 660, 658 N.E.2d 706 (1995), the New York Court of Appeals determined that the New York harassment statute's limiting clause " 'without legitimate purpose of communication' . . . expressly excludes constitutionally protected speech from its reach [and] plainly distinguishes this statute from those which impose criminal liability for 'pure speech.' " *Shack*, 658 N.E.2d at 710. The court concluded that because of the restrictive clause the defendant could not rely successfully on the First Amendment to support a challenge to its facial validity, *id.*, and it is this limitation that distinguishes the statute from those harassment statutes that have been declared unconstitutionally broad. *Shack*, 658 N.E.2d at 711 (citing *People v. Klick*, 66 Ill.2d 269, 5 Ill.Dec. 858, 362 N.E.2d 329 (1977)).

In *McKillop v. Alaska*, 857 P.2d 358 (Alaska Ct.App.1993), the Court of Appeals of Alaska also determined that a harassment statute was not unconstitutionally overbroad. The court noted that the harassment statute had the potential, in addition to prohibiting conduct, "to punish political speech or other legitimate communication upon proof that one of the speaker's subsidiary motives was to annoy the listener." *McKillop*, 857 P.2d at 365. The court further stated: "We agree that a person engaging in advocacy or criticism may legitimately intend to annoy or disturb his or her listeners. Nevertheless, 'the right of every person to be left alone must be [weighed] in the scales [against] the right of others to communicate.' " *McKillop*, 857 P.2d at 364 (alterations in original) (quoting *Rowan v. United States Post Office Dept.*, 397 U.S. 728, 736, 90 S.Ct. 1484, 1490, 25 L.Ed.2d 736 (1970)).[37] To avoid an

---

**37.** In *Rowan v. United States Post Office Dept.*, 397 U.S. 728, 738, 90 S.Ct. 1484, 1491,25 L.Ed.2d 736 (1970), the U.S. Supreme Court rejected the right of mail order companies to send unsolicited materials to persons who had asked that their names be removed from mailing lists. The Court stated: "[i]f this prohibition operates to impede the flow of even valid ideas, the answer is that no one has a right to press even 'good' ideas on an unwilling recipient." *Id.*

overbroad construction, the court interpreted the statute "to prohibit telephone calls only when the call has no legitimate *communicative purpose,* when the caller's speech is devoid of any substantive information and the caller's sole intention is to annoy or harass the recipient." *Id.* (emphasis added).

On the same note and most recently, the Supreme Court of Kansas, in *Kansas v. Whitesell,* 270 Kan. 259, 13 P.3d 887 (2000), determined that a stalking statute, worded similarly to § 123, was not unconstitutionally overbroad.[38] The court reasoned:

A criminal statute should not infringe upon the First Amendment. The First Amendment, however, is not an impenetrable shield which protects any speech or conduct, whatsoever, with disregard to its harm and effect. Despite our First Amendment rights, we are not free to harm others under the guise of free speech. "As speech strays further from the values of persuasion, dialogue and free exchange of

---

**38.** Kansas Statute Annotated § 21–3438, "Stalking," states, in pertinent part:

(a) Stalking is an intentional, malicious and repeated following or harassment of another person and making a credible threat with the intent to place such person in reasonable fear for such person's safety.

\* \* \*

(d) For the purposes of this section: (1) "Course of conduct" means a pattern of conduct composed of a series of acts over a period of time, however short, evidencing a continuity of purpose and which would cause a reasonable person to suffer substantial emotional distress, and must actually cause substantial emotional distress to the person. Constitutionally protected activity is not included with the meaning of "course of conduct."

(2) "Harassment" means a knowing and intentional course of conduct directed at a specific person that seriously alarms, annoys, torments or terrorizes the person, and that serves on legitimate purpose.

(3) "Credible threat" means a verbal or written threat, including that which is communicated via electronic means, or a threat implied by a pattern of conduct or a combination of verbal or written statements and conduct made with the intent and the apparent ability to carry out the threat so as to cause the person who is the target of the threat to reasonably fear for such person's safety. The present incarceration of a person making the threat shall not be a bar to prosecution under this section.

ideas, and moves toward willful threats to perform illegal acts, the State has greater latitude to regulate expression." *People v. Borrelli,* 77 Cal.App.4th 703, 91 Cal.Rptr.2d 851 (2000) (referring to *Shackelford v. Shirley,* 948 F.2d 935, 938 (5 Cir.1991)). "Application of the overbreadth doctrine ... is, manifestly, strong medicine. It has been employed by the Court sparingly and only as a last resort." *Broadrick,* 413 U.S. at 613, 93 S.Ct. 2908. Concerning stalking laws, there must be a balance that is struck between our constitutional right to free speech and our personal right to be left alone.

*Whitesell,* 13 P.3d at 900–01.

The Kansas court then favorably repeated the following quote:

"Many crimes can consist solely of spoken words, such as soliciting a bribe ... or making a terrorist threat.... The state may penalize threats, even those consisting of pure speech, provided the relevant statute singles out for punishment threats falling outside of the scope of the First Amendment protection.... In this context, the goal of the First Amendment is to protect expression that engages in some fashion public dialogue, that is 'communication in which the participants seek to or are persuaded; communication which is about changing or maintaining beliefs, or taking or refusing to take action on the basis of one's beliefs.... A statute that is otherwise valid, and is not aimed at protected expression, does not conflict with the First Amendment simply because the statute can be violated by the use of the spoken words."

*Whitesell,* 13 P.3d at 901 (alterations in original) (quoting *Borrelli,* 77 Cal.App.4th at 714, 91 Cal.Rptr.2d 851 (quoting *Roberts,* 468 U.S. at 628, 104 S.Ct. 3244, 82 L.Ed.2d 462; *Aguilar v. Avis Rent A Car System, Inc.,* 21 Cal.4th 121, 87 Cal.Rptr.2d 132, 980 P.2d 846 (1999))); *see also Parker v. Commonwealth of Virginia,* 24 Va.App. 681, 485 S.E.2d 150 (1997).

Petitioner cites other out-of-state cases in which a statute was deemed to be unconstitutionally vague despite an intent

requirement. These cases, however, do not discuss statutes with the restrictive language of § 123—"does not apply to any peaceable activity intended to express political view or provide information to others"—and are worded quite differently from § 123. For instance, in *Bolles v. People,* the Supreme Court of Colorado found that the Colorado harassment statute was unconstitutionally overbroad because the dictionary definitions of "intent to alarm" and "annoy," as used in the statute, would render criminal such acts as forecasting a storm and warning against illnesses. *Bolles,* 541 P.2d at 81. The court concluded that even reading in restrictive language such as "no legitimate purpose" would not save the statute from being overbroad, but instead would inject vagueness into the statute. *Id.* As discussed, *supra,* § 123 does not contain the language "legitimate purpose" but employs instead "legal purpose," which is more restrictive, in addition to the restriction that § 123 does not apply to "peaceable activity intended to express political views or provide information to others." We conclude that other out-of-state cases, on which Petitioner relies, are distinguishable from the present case.[39]

### III. Sufficiency of the Evidence

Petitioner contends that the evidence presented in the agreed statement of facts in the present case was insuffi-

---

**39.** Petitioner relies on cases in which the statutes are worded quite differently than § 123 and do not contain limiting language. *See Moore,* 37 Wash.App. 862, 683 P.2d 617 (holding that Washington's harassment statute was unconstitutionally overbroad because it covered constitutionally protected speech); *Wisconsin v. Dronso,* 90 Wis.2d 110, 279 N.W.2d 710 (Ct.App.1979) (concluding that a disorderly conduct statute with the language "with intent to annoy another, makes a telephone call, whether or not conversation ensues" was overly broad because the statute "sweeps too broadly" in speech constitutionally protected and because the statute was not precisely worded with limitations); *People v. Klick,* 66 Ill.2d 269, 5 Ill.Dec. 858, 362 N.E.2d 329 (1977) (determining that a disorderly conduct statute with the language "with intent to annoy another, makes a telephone call, whether or not conversation thereby ensues" was overly broad because it was applicable to all phone calls and was not limited to unreasonable conduct such as threats, curses, and obscenities).

cient to prove beyond a reasonable doubt that Petitioner was guilty of violating § 123. We disagree. We have declared that upon appellate review the "applicable standard is whether after viewing the evidence in the light most favorable to the prosecution *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Bloodsworth v. State,* 307 Md. 164, 167, 512 A.2d 1056, 1057 (1986); *see State v. Sowell,* 353 Md. 713, 726, 728 A.2d 712, 719 (1999).

> Our concern, therefore, is not whether the verdict was in accord with the weight of the evidence but rather, whether there was sufficient evidence produced at trial "that either showed directly, or circumstantially, or supported a rational inference of facts which could fairly convince a trier of fact of the defendant's guilt of the offenses charged beyond a reasonable doubt."

*Sowell,* 353 Md. at 726, 728 A.2d at 719 (quoting *State v. Stanley,* 351 Md. 733, 750, 720 A.2d 323, 331 (1998); *State v. Albrecht,* 336 Md. 475, 479, 649 A.2d 336, 337 (1994)).

Applying this standard, we conclude that there was sufficient evidence to support Petitioner's conviction of harassment. Petitioner sent Javin 122 letters to her place of residence between 11 April 1997 and 11 March 1998. He also sent an additional 11 letters to Javin at her parent's residence during this period. Javin had a specific reason to fear Petitioner due to the fact that at the time that he sent the letters, he was serving a finite prison term, 12 years, for previously stalking and kidnapping Javin. Petitioner also was ordered, as part of his earlier sentence, to have no contact with Javin. Moreover, it was stipulated that Javin's testimony would be that, because of the letters, she feared that Petitioner would kill her when he was released from prison, which she believed would be in April 1999. Additionally, Javin, her parents, Petitioner's former attorney, and the assistant warden and the correctional psychologist at the prison, had requested, both before and after 17 April 1997, that Petitioner not send letters to Javin.

█ Petitioner maintains that the letters were part of "a peaceable activity intended to express political views or provide information to others" and that they had a "legal purpose" so that § 123 did not apply to his conduct. According to Petitioner, the "letters were basically *intended* to provide religious information to Javin, to express concern for her religious future and to convince Javin of Petitioner's love for her." (Emphasis added). After the initial few letters, however, Galloway was warned multiple times that Javin did not wish to receive communications from him. Those instructions notwithstanding, he continued his course by sending a large number of additional letters. From this, a reasonable fact-finder reasonably could conclude that Galloway's intent was, in fact, to harass Javin, rather than merely to engage in a peaceable activity, with a legal purpose. We have stated that "the determination of an accused's intention is, in the first instance, for the trial judge, when sitting without a jury, and this determination will not be disturbed on appeal unless clearly erroneous." *State v. Raines*, 326 Md. 582, 590, 606 A.2d 265, 268 (1992) (citing *Taylor v. State*, 238 Md. 424, 433, 209 A.2d 595, 600 (1965)), *cert. denied*, 506 U.S. 945, 113 S.Ct. 390, 121 L.Ed.2d 299 (1992). Furthermore, "since intent is subjective and, without the cooperation of the accused, cannot be directly and objectively proven, its presence must be shown by established facts which permit a proper inference of its existence." *Raines*, 326 Md. at 591, 606 A.2d at 268 (internal quotation marks omitted) (quoting *State v. Earp*, 319 Md. 156, 157, 571 A.2d 1227, 1233 (1990)).

The evidence in the record supports the trial court's explicit and implicit conclusions that the letters were meant beyond a reasonable doubt, (1) to harass, alarm, or annoy Javin and (2) necessarily were not intended as the dissemination of mere religious instruction. *See supra* note 3. It was not necessary, as Petitioner contends, that the trial judge specifically discuss whether the exceptions of "peaceable activity" and "legal purpose" applied to the present case. It was enough that the trial judge found that the harassment elements of the statute had been satisfied. Taking into account the plethora of let-

ters, Petitioner's prior convictions of stalking and kidnapping Javin, and the numerous requests for Petitioner to stop sending the letters, the trial judge could find, as Javin herself did, that the frequent references in the letters to Petitioner being "Moses and the enforcer of the law and God's and Jesus's ambassador" meant that Petitioner intended to kill her so that they could be together again, but in a non-corporeal way. Although the threat may not have been explicit, and even considering that some of the letters began with such statements as "[n]othing in this letter is meant to be a threat," a threat reasonably may be inferred considering all of the circumstances presented and the other language in the letters. *See supra* note 3. As the Court of Special Appeals stated, "[a] person of common intelligence would have no trouble understanding that frequent written communication by a convicted felon to the home of a person whom he previously kidnapped and stalked, will seriously annoy or alarm the recipient." *Galloway*, 130 Md.App. at 100, 744 A.2d at 1076. Analogously, as noted above, we have acknowledged previously that the commission of a "battery or assault and battery referred to in the protective order ... may have special relevance to the intent" element of § 123. *Streater*, 352 Md. at 816, 724 A.2d at 119.

Furthermore, sufficient evidence supported the conclusion that the act of writing and mailing the letters was malicious and was not, as Petitioner argues, merely a minimal intrusion that Javin could have avoided by throwing out the letters, unopened, that came from Petitioner or bore his return address at MCTC. It is true that Javin, after receiving and reading a few of the letters, could have stopped reading them; however, the sheer volume of letters received from the known source and the pre-existing circumstances that created the background context surrounding the letters from that source are enough to support a finding of malice and more than a minimal intrusion. The mere sending and receipt of that volume of letters, coming after the warnings to Galloway, even had Javin not opened them, supported a reasonable inference

of Galloway's unlawful intent and the adverse effects on the victim.

We conclude that there was sufficient evidence to find Petitioner's sending of the letters was a malicious engagement in a course of conduct that alarmed or seriously annoyed Javin (or a reasonable person in the same circumstances) and that Petitioner engaged in this course of conduct with the intent to harass, alarm, or annoy Javin. Petitioner received several reasonable warnings and requests to desist such conduct. It also is evident from the record that Petitioner acted without a legal purpose.

*JUDGMENT AFFIRMED, WITH COSTS*

ELDRIDGE, Judge, dissenting.

The majority interprets "course of conduct" proscribed by Maryland Code (1957, 1996 Repl Vol., 2000 Supp.), Art. 27, § 123, as encompassing the repeated sending of communications, *i.e.,* first class mail containing religious views, expressions of feelings, and apologies for past conduct. The majority also interprets § 123 to authorize criminal punishment for that course of conduct where the sender of the communications had been requested to stop sending them, and where the recipient of the communications was seriously annoyed or alarmed by them. The majority further holds, without any explanations, that such conduct is "[w]ithout a legal purpose" within the meaning of § 123(c)(3) and is not encompassed by the "provid[ing] of information" exception in § 123(b).

In my view, Art. 27, § 123, as interpreted by the Court today, is unconstitutionally overbroad and vague in violation of the First Amendment, the Due Process Clause of the Fourteenth Amendment, and Articles 24, 36, and 40 of the Maryland Declaration of Rights.[1] Although the majority purports

---

1. The majority states (opinion at 609, n. 5) that the petitioner "makes no arguments under the Maryland Constitution or Declaration of Rights." The single question presented in the petition for a writ of certiorari, and repeated verbatim in the petitioner's brief, was not limited to the First and Fourteenth Amendments to the United States

to place a "judicial gloss" on § 123 (opinion at 610) and to "employ a limiting construction to the statute" (*id.* at 619), the

---

Constitution. Instead, the question presented was broadly worded as follows:

> "Did the trial court err in denying Petitioner's motion to dismiss and in convicting him of harassment under Md. Ann.Code, Art. 27, § 121A, now codified with minimal changes as § 123, specifically in the face of a challenge that the statute is unconstitutionally vague and overbroad on its face and as applied to Petitioner and in the face of a challenge that the facts did not support such a conviction?"

The question encompasses vagueness and overbreadth under the Maryland Declaration of Rights as well as under the First and Fourteenth Amendments. The majority seems to assert that the petitioner's overbreadth and vagueness arguments in his brief and reply brief are based solely on federal constitutional grounds and not on state constitutional grounds. Except for a few references on two different pages to "First Amendment guarantees," or "liberties" or "expression," the petitioner's overbreadth and vagueness arguments in his briefs are general and equally applicable under the Fourteenth Amendment or the Maryland Declaration of Rights. Moreover, in cases decided by the Court of Special Appeals, or by a circuit court in the exercise of its appellate jurisdiction, the issues before this Court are determined by the certiorari petition, any cross-petition, and any order of this Court limiting or expanding the issues. Maryland Rule 8–131(b). *See, e.g., Wynn v. State,* 351 Md. 307, 319–324, 718 A.2d 588, 594–597 (1998); *Professional Nurses v. Dimensions,* 346 Md. 132, 138–139, 695 A.2d 158, 161 (1997); *Am. Motorists Ins. Co. v. ARTRA Group, Inc.,* 338 Md. 560, 568–569, 659 A.2d 1295, 1299 (1995); *Maryland State Police v. Zeigler,* 330 Md. 540, 562–563, 625 A.2d 914, 925 (1993), and cases there cited.

Articles 24, 36, and 40 of the Declaration of Rights provide as follows:

"**Article 24. Due process.**

"That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land."

\* \* \*

"**Article 36. Religious freedom.**

"That as it is the duty of every man to worship God in such manner as he thinks most acceptable to Him, all persons are equally entitled to protection in their religious liberty; wherefore, no person ought by any law to be molested in his person or estate, on account of his religious persuasion, or profession, or for his religious practice, unless, under the color of religion, he shall disturb the good order, peace or safety of the State, or shall infringe the laws of morality, or injure others in their natural, civil or religious rights...."

\* \* \*

"**Article 40. Freedom of press and speech.**

"That the liberty of the press ought to be inviolably preserved; that every citizen of the State ought to be allowed to speak, write and publish his sentiments on all subjects, being responsible for the abuse of that privilege."

result of the majority's efforts, in my opinion, is that the statute now suffers more from overbreadth and vagueness than the literal language crafted by the General Assembly.

## I.

Before discussing in detail the unconstitutional overbreadth and vagueness of § 123 as interpreted by the majority, it would be useful to discuss some of the general principles applicable to this case and to clarify what is before the Court.

## A.

In its initial discussion of § 123's constitutionality, the majority relies upon the principles that a statute is presumed valid and that the "party attacking the statute has the burden of establishing its unconstitutionality." (Opinion at 610–611). While these principles are generally applicable in resolving constitutional challenges, nevertheless, when a statute or other government action interferes with speech or other freedoms protected by the First Amendment and Articles 36 and 40 of the Maryland Declaration of Rights, the statute or other government action is subject to scrutiny and must be justified by a showing of sufficient governmental interest. Although the level of scrutiny and the type of governmental interest may vary depending upon the nature of the interference with speech or other protected activity, "the burden is on the government to show the existence of such interest." *Elrod v. Burns,* 427 U.S. 347, 362, 96 S.Ct. 2673, 2684, 49 L.Ed.2d 547, 559 (1976), and cases there cited.

Even in *Eanes v. State,* 318 Md. 436, 446, 569 A.2d 604, 609, *cert. denied,* 496 U.S. 938, 110 S.Ct. 3218, 110 L.Ed.2d 665 (1990), an aberrant decision relied upon by the majority today, this Court acknowledged:

"The fundamental importance of free speech in our constitutional scheme requires, however, that restrictions on its exercise be subjected to searching scrutiny."

*See, e.g., Denver Area Educ. Telecom. Consortium v. F.C.C.,* 518 U.S. 727, 766, 116 S.Ct. 2374, 2397, 135 L.Ed.2d 888, 917

(1996) ("the Government cannot sustain its burden of showing that § 10(c) [authorizing cable television operators to prevent the transmission of 'patently offensive' programming on public access channels] is necessary to protect children or that it is appropriately tailored to secure that end"); *Rubin v. Coors Brewing Co.,* 514 U.S. 476, 487, 115 S.Ct. 1585, 1592, 131 L.Ed.2d 532, 541 (1995) ("the Government carries the burden of showing that the challenged regulation [of speech] advances the Government's interest 'in a direct and material way'"); *U.S. v. National Treasury Employees Union,* 513 U.S. 454, 468, 115 S.Ct. 1003, 1014, 130 L.Ed.2d 964, 980 (1995) (the Court discussed the different degrees of "the Government's burden" depending on the nature of the statutory restriction upon speech); *Turner Broadcasting System, Inc. v. F.C.C.,* 512 U.S. 622, 661–662, 664, 114 S.Ct. 2445, 2469, 2470, 129 L.Ed.2d 497, 530 (1994) (content-based regulations of speech require "application of the most exacting level of First Amendment scrutiny" whereas "the intermediate level of scrutiny [is] applicable to content-neutral restrictions that impose an incidental burden on speech," although even with respect to the latter restrictions the government "must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate those harms in a direct and material way"); *Widmar v. Vincent,* 454 U.S. 263, 269–270, 102 S.Ct. 269, 274, 70 L.Ed.2d 440, 447–448 (1981) ("In order to justify discriminatory exclusion from a public forum based on the religious content of" speech, the state "must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end"); *Schad v. Borough of Mount Ephraim,* 452 U.S. 61, 71, 101 S.Ct. 2176, 2184, 68 L.Ed.2d 671, 682 (1981) ("Because the ordinance challenged in this case significantly limits communicative activity . . ., we must scrutinize both the interests advanced by the [governmental entity] to justify this limitation on protected expression and the means chosen to further those interests"); *First Nat. Bank of Boston v. Bellotti,* 435 U.S. 765, 786, 98 S.Ct. 1407, 1421, 55 L.Ed.2d 707, 724 (1978) (the challenged statute must "survive the exacting scrutiny necessitated by a

state-imposed restriction of freedom of speech.... '[T]he State may prevail only upon showing a subordinating interest which is compelling ... and the burden is on the Government to show the existence of such an interest' "); *Jakanna v. Montgomery County*, 344 Md. 584, 608, 689 A.2d 65, 76 (1997) ("the burden of proof rests on the County to prove that [the ordinance restricting speech] directly advances a substantial government interest and is not any more extensive than necessary to achieve that interest").

Consequently, the majority errs in placing the entire burden of establishing unconstitutionality upon the petitioner Galloway. Furthermore, the majority's reliance on its conclusion, that " § 123 regulates unprotected conduct" (opinion at 611 n. 9), to justify placing the burden on the petitioner, is somewhat circular.

## B.

Although the majority purports to treat separately the issues of overbreadth under the First Amendment and vagueness under due process requirements, the majority does seem to acknowledge the interaction between the two constitutional principles when a statute is challenged on both overbreadth and vagueness grounds. The Supreme Court thus explained in *Smith v. Goguen*, 415 U.S. 566, 572–573, 94 S.Ct. 1242, 1246–1247, 39 L.Ed.2d 605, 611–612 (1974) (emphasis added, footnotes omitted):

"We agree with the holdings of the District Court and the Court of Appeals on the due process doctrine of vagueness. The settled principles of that doctrine require no extensive restatement here. The doctrine incorporates notions of fair notice or warning. Moreover, it requires legislatures to set reasonably clear guidelines for law enforcement officials and triers of fact in order to prevent arbitrary and discriminatory enforcement. *Where a statute's literal scope, unaided by a narrowing state court interpretation, is capable of reaching expression sheltered by the First Amendment, the doc-*

*trine demands a greater degree of specificity than in other contexts."*

*See also, e.g., Gentile v. State Bar of Nevada,* 501 U.S. 1030, 1051, 111 S.Ct. 2720, 2732, 115 L.Ed.2d 888, 908 (1991) ("The prohibition against vague regulations of speech is based in part on the need to eliminate the impermissible risk of discriminatory enforcement.... The question is not whether discriminatory enforcement occurred here, and we assume it did not, but whether the [enactment] is so imprecise that discriminatory enforcement is a real possibility"); *Interstate Circuit, Inc. v. City of Dallas,* 390 U.S. 676, 682, 88 S.Ct. 1298, 1302, 20 L.Ed.2d 225, 231 (1968) (where statutory standards, challenged "as unconstitutionally vague," are applied to activity "protected by the First Amendment, ... we start with the premise that '[p]recision of regulation must be the touchstone' "); *NAACP v. Button,* 371 U.S. 415, 432, 433, 83 S.Ct. 328, 337, 338, 9 L.Ed.2d 405, 417–418 (1963) ("[S]tandards of permissible statutory vagueness are strict in the area of free expression. * * * Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity").

Moreover, the majority correctly states that when a "challenged statute ... encroaches upon fundamental constitutional rights, particularly First Amendment guarantees of free speech and assembly, then the statute should be scrutinized for vagueness on its face" (opinion at 616), and that "[b]ecause of the potential 'chilling effect' that vagueness can have on First Amendment liberties," a defendant is permitted " 'to challenge the validity of a statute even though the statute as applied to the defendant is constitutional.' " (*Id.* at 616–617, quoting *Ayers v. State,* 335 Md. 602, 625, 645 A.2d 22, 33 (1994), *cert. denied,* 513 U.S. 1130, 115 S.Ct. 942, 130 L.Ed.2d 886 (1995)). *See also, e.g., Los Angeles Police Dept. v. United Rep. Pub.,* 528 U.S. 32, 38, 120 S.Ct. 483, 488, 145 L.Ed.2d 451, 459 (1999) (" 'At least when statutes regulate or proscribe speech ... the transcendent value to all society of constitutionally protected expression is deemed to justify "allowing attacks on overly broad statutes with no requirement that the

person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity," ' " quoting *Gooding v. Wilson*, 405 U.S. 518, 520–521, 92 S.Ct. 1103, 1105, 31 L.Ed.2d 408, 413 (1972), quoting *Dombrowski v. Pfister*, 380 U.S. 479, 486, 85 S.Ct. 1116, 1121, 14 L.Ed.2d 22, 28 (1965)); *Schad v. Borough of Mount Ephraim, supra*, 452 U.S. at 66, 101 S.Ct. at 2181, 68 L.Ed.2d at 679 ("Because appellants' claims are rooted in the First Amendment, they are entitled to rely on the impact of the ordinance on the expressive activities of others as well as their own. 'Because overbroad laws, like vague ones, deter privileged activit[ies], our cases firmly establish appellant's standing to raise an overbreadth challenge.' *Grayned v. City of Rockford*, 408 U.S. 104, 114, 92 S.Ct. 2294, 2302, 33 L.Ed.2d 222 (1972)"); *Secretary of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 966–967, 104 S.Ct. 2839, 2852, 81 L.Ed.2d 786, 802 (1984), affirming *Joseph H. Munson Co. v. Sec. of State*, 294 Md. 160, 448 A.2d 935 (1982).

### C.

It is important to clarify just what is and what is not before the Court in the present case. George Galloway and Kimberly Javin had formerly lived together, and later Javin terminated the relationship. Thereafter, in 1995 Galloway was convicted of stalking and kidnapping Javin and was sentenced to prison for 12 years with all but seven years suspended. He was to be on probation for the suspended portion and was directed, as a condition of probation, to have no contact with Javin. Nevertheless, the case at bar is not a prosecution based on Galloway's 1994 and 1995 conduct and is not a proceeding based upon an alleged violation of probation. Although the majority indicates that the trial judge's "conclusions" in the present case properly took "into account ... Petitioner's prior convictions" and "the pre-existing circumstances" (opinion at 651, 652), the majority does not suggest that Art. 27, § 123, is limited to circumstances where there was prior criminal involvement with the victim. Furthermore, nothing in the statutory language would support such a limita-

tion. Persons who have never previously been convicted of any criminal offense are equally subject to § 123. In addition, the majority appears to rely on the 1995 convictions only as evidence that Galloway in 1997 and 1998 had the "intent to harass, alarm, or annoy" Javin. While this inference may be debatable, it clearly has no bearing upon the vagueness or overbreadth of the statutory language or whether other statutory requirements were met.[2]

This case is also not concerned with the restrictions upon First Amendment or other constitutional rights which may legitimately be imposed upon inmates of a correctional institution because of security or other "needs and exigencies of the institutional environment," *Wolff v. McDonnell,* 418 U.S. 539, 555, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935, 950 (1974). Thus, regulations placing certain types of restrictions upon mail which an inmate may send from the institution to someone on the outside, or upon mail which an inmate may receive from someone on the outside, may be valid. *See, e.g., Bell v. Wolfish,* 441 U.S. 520, 548–555, 99 S.Ct. 1861, 1879–1882, 60 L.Ed.2d 447, 474–479 (1979); *Secretary v. Allen,* 286 Md. 133, 137–141, 406 A.2d 104, 106–109 (1979); *Thomas v. State,* 285 Md. 458, 462–469, 404 A.2d 257, 260–263 (1979). Again, § 123 is not limited to inmates of an institution, and the majority does not suggest otherwise. Section 123 applies to persons who are not, and have never been, in a correctional institution or place of detention. The only relevance of Galloway's inmate status may be to the statutory requirement in § 123(c)(3) that the proscribed conduct be "[w]ithout a legal purpose." Maryland correctional institutions, pursuant to regulations, can censor mail sent by inmates to persons outside of the institutions. *See* COMAR 12.02.20.02 *et seq. See also*

---

**2.** It may well be that a clearly drafted and narrowly tailored statute, prohibiting the repeated sending of unwanted communications to a person, where the sender had previously been convicted of a violent crime against the recipient or had been the subject of a domestic violence protective order involving the recipient, or had threatened the victim's life, would be constitutional. As pointed out above, however, § 123 is not such a statute.

*Thomas v. State, supra,* 285 Md. 458, 404 A.2d 257. The letters sent by Galloway to Javin were permitted by the institutional authorities.

Furthermore, unlike *Rowan v. United States Post Office Department,* 397 U.S. 728, 90 S.Ct. 1484, 25 L.Ed.2d 736 (1970), relied on by the majority, the case at bar does not involve a clearly and narrowly written statute authorizing a carrier (*e.g.,* the Post Office Department) to refrain from delivering *advertisements* to recipients who have notified the carrier that they do not wish to receive them, and which is enforceable by a *civil* remedy. Instead, this is a criminal prosecution, under a vague statute, of one who has repeatedly sent first class mail, expressing feelings, religious views, and apologies, to a person who did not wish to receive such mail.[3]

Finally, while the majority refers to the principle that the trial judge's findings of fact " 'will not be disturbed on appeal unless clearly erroneous' " (opinion at 650), it should be emphasized that there was no dispute about the basic or historical facts in this case. The case was tried entirely on a written agreed statement of facts which the prosecuting attorney read into the record, plus one additional fact agreed to by the prosecuting attorney and defense counsel, and 13 of the letters which were submitted to the trial court as "sample[s]."

In addition, contrary to the statement in the majority opinion, the trial judge made no finding that the letters "were not intended as the dissemination of mere religious instruction." (Opinion at 650). In rendering his verdict, the trial judge expressly made only one finding of fact, namely that "the intent of the defendant's letters was clearly to annoy or to harass." [4] No finding was made concerning the exception

---

3. Furthermore, the overbreadth doctrine would not be applicable in the *Rowan* situation because "the overbreadth doctrine does not apply to commercial speech." *Village of Hoffman Estates v. Flipside,* 455 U.S. 489, 497, 102 S.Ct. 1186, 1192, 71 L.Ed.2d 362, 370 (1982).

4. The entire transcript relating to the trial court's rendition of the verdict is as follows:

in § 123(b) for "peaceable activity intended to ... provide information to others." At the time the verdict was rendered, no finding was made relating to the element of the offense in § 123(c)(3) that the conduct be "[w]ithout a legal purpose." No finding was made that the letters themselves contained threats. And, in this connection, Ms. Javin's statement to the trial court indicated that the grounds for her fears were primarily the events in 1994 and 1995 rather than the letters. She stated:

"THE COURT: I think the underlying question here is whether a defendant who is incarcerated can commit the crime of harassment as it relates to someone who is not incarcerated.

"The statute that the Court has for consideration is Article 27, Section 121A. It provides in pertinent part that a person who maliciously engages in a course of conduct that either alarms or seriously annoys another person, with the intent to harm, annoy or to alarm, after reasonable warning to stop it, has committed the crime of harassment.

"The facts of this case are that the defendant sent over 130 letters over a period of 11 months. In reading the letters, and taking into consideration the relationship between these two people, this Court is satisfied that the intent of the defendant's letters was clearly to annoy or to harass. I am satisfied to that beyond a reasonable doubt.

"Accordingly, I am satisfied that the elements of the statute have been satisfied. I am satisfied further that they have been met or proven beyond a reasonable doubt and the Court enters a verdict of guilty to the crime of harassment.

"Even though Judge Thieme may have made some comment about he couldn't stop the defendant from writing, I can't stop him from writing. I will tell you that. I cannot stop him from writing. Even if I cut your hands off, you would probably find some way to write.

"But what I am telling you is that when you do this in the manner in which you did it, where there is clear inference to be drawn from it and intent to annoy or to harass, it is harassment. If you keep doing it, you are going to probably keep getting charged and keep getting convicted. You will end up serving a life sentence 90 days at a time. Anything else?"

The majority quotes (opinion at 609–610) a paragraph from the trial judge stating certain "conclu[sions]" based on the evidence, including a statement that the letters were "personal" and that, therefore, "the Court *can* find that they served no legal purpose." (Emphasis added). This paragraph was from the trial judge's written opinion of October 28, 1998, denying the defendant's motion to dismiss and motion for judgment of acquittal. The trial judge rendered his verdict at a proceeding on November 4, 1998, after hearing arguments on "guilt or innocence as to the harassment charge." Thereafter on November 4th, the trial court went on to conduct a sentencing hearing.

"MS. JAVIN: Going in the car down that dirt road he told me that he was going to kill me and bury my body with a piece of machinery that was on the side of the road. All during that time he threatened to kill me.

"So I have real fear and reason to believe that when he gets out, he will follow through with what he had said he was going to do. He is clever enough not to write it down in his letters so that he can follow through with his plan for sure."

\* \* \*

"I have spoken to people at the prison to try to get them to stop him from writing letters. But even if he stopped writing the letters, I still am fearful for when he gets out what he is going to do. I just don't know how I am going to be protected."

Furthermore, in assessing the facts in a case such as this, we must heed the Supreme Court's admonition that "in cases raising First Amendment issues ... an appellate court has an obligation to 'make an independent examination of the whole record' in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.' " *Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 499, 104 S.Ct. 1949, 1958, 80 L.Ed.2d 502, 515 (1984), quoting *New York Times Co. v. Sullivan,* 376 U.S. 254, 284–286, 84 S.Ct. 710, 728–729, 11 L.Ed.2d 686 (1964). *See also, e.g., Gentile v. State Bar of Nevada, supra,* 501 U.S. at 1038, 111 S.Ct. at 2726, 115 L.Ed.2d at 900 ("Full deference to these factual findings does not justify abdication of our responsibility to determine whether petitioner's statements can be punished consistent with First Amendment standards"); *Bachellar v. Maryland,* 397 U.S. 564, 566, 90 S.Ct. 1312, 1313, 25 L.Ed.2d 570, 573 (1970) ("Since petitioners argue that their conduct was constitutionally protected, we have examined the record for ourselves. When 'a claim of constitutionally protected right is involved, it "remains our duty \* \* \* to make an independent examination of the whole record." ' *Cox v. Louisi-*

*ana (I)*, 379 U.S. 536, 545 n. 8, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965)").[5]

## D.

The majority relies upon the recitation in § 123(b) that the statute "does not apply to any peaceable activity intended to express political views or provide information to others." The majority states that this exception, which " 'expressly excludes constitutionally protected speech from its reach,' "[6] distinguishes § 123 from other harassment statutes which have been held unconstitutional. (Opinion at 644).

As this Court has pointed out, however, a recitation in a statute that the statute does not apply so as to impair constitutional rights does not affect the resolution of the underlying constitutional issues; it simply equates the constitutional issues with the statutory interpretation issues. For example, in *Washington Nat'l Arena v. Pr. Geo's Co.*, 287 Md. 38, 44, 410 A.2d 1060, 1064, *cert. denied*, 449 U.S. 834, 101 S.Ct. 106, 66 L.Ed.2d 40 (1980), involving the constitutionality of a retroactive statute which contained a similar disclaimer that the statute did not apply so as to impair constitutional rights, this Court stated:

> "The issue in this case could be viewed either as one of statutory interpretation or as a matter of constitutionality. It makes no practical difference whichever way it is viewed. The Legislature, in Ch. 129 of the Acts of 1976, expressly stated its intention that the statute should not apply 'whenever constitutionally protected rights would be impaired.' Consequently, from a technical viewpoint, if the retroactive application of the 1976 tax statute to the recordation of written instruments at various times between September 1968 and 1976 would impair taxpayers' constitutional rights,

---

**5.** The Supreme Court's *Bachellar* decision invalidated, on First Amendment grounds, a criminal conviction under a former § 123 of Art. 27 of the Maryland Code.

**6.** Quoting from *People v. Shack*, 86 N.Y.2d 529, 535, 634 N.Y.S.2d 660, 658 N.E.2d 706, 710 (1995).

then, as a matter of legislative intent, the statute does not apply. However, in order to determine the application of Ch. 129 on this statutory interpretation ground, it is obviously necessary to resolve the constitutional question."

*See also Turner Broadcasting System, Inc. v. F.C.C., supra,* 512 U.S. at 642–643, 114 S.Ct. at 2459, 129 L.Ed.2d at 518 ("Nor will the mere assertion of a content-neutral purpose be enough to save a law which" is not content-neutral).

### E.

The "[p]rohibited conduct" under Art. 27, § 123(c), requires for a violation, *inter alia,* that the defendant's course of conduct be "[w]ith intent to harass, alarm, or annoy the other person...." § 123(c)(1). The majority states that, instead of an intent to harass, alarm, or annoy "the other person," a "reasonable person standard should be read into the language of subsection (c)(1) of § 123, and with that judicial gloss, § 123 survives constitutional scrutiny." (Opinion at 610–611). Thus, in lieu of "the other person," the object of the intent set forth in subsection (c)(1) becomes "a reasonable person."

This Court, however, has generally declined to re-write or insert words into statutory language in order to save the constitutionality of statutes. Just this year, in *Montrose Christian School v. Walsh,* 363 Md. 565, 594–596, 770 A.2d 111, 128–129 (2001), we refused to construe the word "purely" in a statute as "primarily" or "some" in order to uphold the statute under the First Amendment and Article 36 of the Maryland Declaration of Rights. Instead, we held the statute unconstitutional, pointing out that a substitution of saving language " 'would be to re-draft the statute under the guise of construction,' " *Montrose Christian School v. Walsh, supra,* 363 Md. at 595, 770 A.2d at 129, quoting *Davis v. State,* 294 Md. 370, 378, 451 A.2d 107, 111 (1982). *See Interstate Circuit, Inc. v. City of Dallas, supra,* 390 U.S. at 690, 88 S.Ct. at 1306, 20 L.Ed.2d at 235 ("It is not our province to draft legislation").

In *Wheeler v. State,* 281 Md. 593, 598, 380 A.2d 1052, 1056 (1977), *cert. denied,* 435 U.S. 997, 98 S.Ct. 1650, 56 L.Ed.2d 86

(1978), this Court held a state statute invalid on equal protection grounds, with Judge Orth stating for the Court:

"We are not at liberty to bring about a different result by inserting or omitting words to make the statute express an intention not evidenced in its original form."

*See also Birmingham v. Board,* 249 Md. 443, 449, 239 A.2d 923, 926 (1968) ("Nor have we the power to correct an omission in the language of a statute, even though the omission was the obvious result of inadvertence").

The majority, in concluding that "§ 123 is salvageable because we shall employ a limiting construction to the statute" (opinion at 619), goes on to rely on the statement in *Schochet v. State,* 320 Md. 714, 729, 580 A.2d 176, 183 (1990), that " '[g]eneral statutes . . ., which, if given their broadest and most encompassing meaning, give rise to constitutional questions, have regularly been the subject of narrowing constructions so as to avoid the constitutional issues.' " (Opinion at 619). As pointed out in the *Schochet* opinion, however, there was statutory "silence" on the coverage issue there involved, and there was a long line of decisions in this Court confirming that the statute did not apply under the circumstances of that case. *Schochet,* 320 Md. at 731–734, 580 A.2d at 184–185. The statute involved in the case at bar, however, is not "silent" with regard to the object of the intent set forth in subsection (c)(1). Under the plain language of subsection (c)(1), the defendant must have the intent to "harass, alarm, or annoy *the other person*" and not to "harass, alarm or annoy" an objective "*reasonable person*" (emphasis added). Moreover, there is no long line of decisions by this Court applying Art. 27, § 123.

Furthermore, in the *Schochet* case the narrowing interpretation of the statute was employed to reverse the defendant's criminal conviction; thus, no issue concerning unfair retroactivity was involved. In the present case, however, the defendant allegedly committed the offense and was convicted prior to this Court's placing a "judicial gloss" on the statute. *See, e.g., Marks v. United States,* 430 U.S. 188, 191–192, 97 S.Ct. 990, 992–993, 51 L.Ed.2d 260, 265 (1977) (While "[t]he *Ex Post*

*Facto* Clause ... does not of its own force apply to the Judicial Branch of government ... [,] the principle on which the Clause is based ... is fundamental to our concept of constitutional liberty. * * * As such, that right is protected against judicial action by the Due Process Clause ..."); *Bouie v. Columbia,* 378 U.S. 347, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964). *See also* the recent opinion in *Rogers v. Tennessee,* 532 U.S. 451, ——, 121 S.Ct. 1693, 1697, 1703, 149 L.Ed.2d 697, 704, 711 (2001) ("[L]imitations on *ex post facto* judicial decisionmaking are inherent in the notion of due process. * * * [F]undamental due process prohibits the punishment of conduct that cannot fairly be said to have been criminal at the time the conduct occurred ...").

Nonetheless, for reasons later set forth in Part II of this dissent, I do not believe that inserting "a reasonable person standard" in subsection (c)(1) cures the overbreadth and vagueness defects in Art. 27, § 123, as interpreted by the majority.

## II.

I shall now turn specifically to the language of Art. 27, § 123, and the majority's interpretation of that language.

### A.

Section 123 reads as follows:

" **§ 123. Harassment.**

"(a) *Course of conduct defined.*—In this section 'course of conduct' means a persistent pattern of conduct, composed of a series of acts over a period of time, that evidences a continuity of purpose.

(b) *Applicability.*—This section does not apply to any peaceable activity intended to express political views or provide information to others.

(c) *Prohibited conduct.*—A person may not follow another person in or about a public place or maliciously engage in a

course of conduct that alarms or seriously annoys another person:

(1) With intent to harass, alarm, or annoy the other person;

(2) After reasonable warning or request to desist by or on behalf of the other person; and

(3) Without a legal purpose.

(d) *Penalty.*—A person who violates this section is guilty of a misdemeanor and, upon conviction, is subject to a fine not exceeding $500 or imprisonment for not more than 90 days or both."

The conduct proscribed by the statute is set forth in subsection (c), and the State must prove four distinct elements to bring the conduct within the prohibition of subsection (c).

*First,* the State must prove either that the defendant followed another person in or about a public place or, alternatively, that the defendant maliciously engaged in "conduct that alarms or seriously annoys" the other person. The alternative "engaged in conduct" element was allegedly involved in the present case.

*Second,* under subsection (c)(1), the State must prove that the defendant acted with one of the alternative requisite intents, namely to harass or to alarm or to annoy the other person. Interestingly, with respect to "annoy," under the initial language of subsection (c) the conduct must in fact "seriously" annoy the other person, whereas the accompanying intent under subsection (c)(1) does not require "serious" annoyance. Also, the prohibited course of conduct under the initial part of subsection (c) is limited to that which alarms or seriously annoys, but the accompanying intent under subsection (c)(1) adds "harass" to "alarm, or annoy."

*Third,* under subsection (c)(2), it must be shown that the defendant had, prior to the charged conduct, been given a reasonable warning or request to desist. This may be the only element of the offense which is set forth with reasonable clarity and is not muddled by the majority.

*Fourth,* under subsection (c)(3), the prosecution must prove that the defendant acted "[w]ithout a legal purpose."

In a case where the State establishes the various elements of the offense set forth in subsection (c), the defendant nevertheless cannot be convicted under § 123 if his conduct fell within either of the exceptions delineated in subsection (b). Subsection (b) excepts from the coverage of the statute peaceable activity which is intended either "to express political views" or to "provide information to others."

Subsection (a) of the statute is the definitional subsection, although it contains a partial definition of only one of the phrases in the statute, namely "course of conduct." The statute contains no definitions of "harass, alarm, or annoy." It contains no definitions of the element "[w]ithout a legal purpose" or of the exception for "provid[ing] information to others."

Where the conduct prohibited by § 123 consists of sending communications, the majority indicates that the prohibition relates to " 'the manner and means employed to' " send the communications " 'rather than their content' " and that " 'the statute proscribes conduct, rather than the content of the mailings' " (opinion at 642, quoting from a Connecticut case). The majority shortly thereafter again indicates that " '[t]he statute is not directed at the content of speech' " (opinion at 643, n. 35, quoting from a Pennsylvania case). The majority goes on to note that "content must be examined" but states that where there is an intent to harass, alarm, or annoy, the content "no longer falls under protected speech" (opinion at 644, n. 36). Later in the opinion, the majority reiterates that content is irrelevant because "[t]he mere sending and receipt of that volume of letters, coming after the warnings to Galloway, *even had Javin not opened them,* supported a reasonable inference of Galloway's unlawful intent and adverse effects on the victim." (opinion at 651–652). The majority's position seems to be that, where the State establishes the intent, effect, and warning elements of subsections (c)(1) and (c)(2), the content of the speech is utterly irrelevant. The majority's

view of the statute is puzzling in light of the distinct requirement in subsection (c)(3) that the State prove that the conduct is "[w]ithout a legal purpose" and the exceptions in subsection (b) for the "express[ion] of political views" and "provid[ing] information to others." How does a court conclude that the sending of letters is without a legal purpose, or is not the expression of political views, or is not the providing of information, without looking at the content of the letters? Somewhat inconsistently, the majority opinion later relies upon the religious *content* of the letters as evidence supporting a finding which "the trial judge *could*" make with regard to Galloway's intent. (opinion at 651, emphasis added).

When the prohibited conduct involves speech or the sending of communications, it seems clear that § 123 is concerned with the *content* of the speech or communications. This is shown by the exceptions in subsection (b) and the "legal purpose" element in subsection (c)(3). Accordingly, § 123, when applied to oral or written speech or communications, requires the "application of the most exacting level of First Amendment scrutiny," rather than "the intermediate level of scrutiny," *Turner Broadcasting System, Inc. v. F.C. C., supra,* 512 U.S. at 661–662, 114 S.Ct. at 2469, 129 L.Ed.2d at 530. Under either level of scrutiny, however, the statute suffers from overbreadth. Moreover, the inconsistency in the majority's interpretation of the statute, with respect to content, helps make a vague statute even vaguer.

## B.

Throughout much of the majority opinion, the Court relies upon the "[w]ithout a legal purpose" element in subsection (c)(3) and the exceptions in subsection (b) as "limiting language" and "inherent restrictions" having "a definite and clear meaning that helps in setting the boundaries for the enforcement of § 123" (opinion at 620–622, 627, 630–631, 637). The majority further points to subsections (c)(3) and (b) as "restrictive language [which] helps to abate any overbreadth" (opinion at 644). The Court also relies on these provisions in distinguishing the Maryland statute from statutes in other

jurisdictions which have been held unconstitutional on overbreadth and/or vagueness grounds (*e.g.*, opinion at 620, 648–649).

After placing so much reliance upon subsections (c)(3) and (b) as "inherent restrictions," however, the majority goes on in the later part of its opinion to construe and apply these provisions in a way that renders them largely nugatory. At the very least, the majority's construction and application of subsections (c)(3) and (b) leave a reader in total bewilderment as to the meaning of the provisions. Instead of helping to cure the overbreadth and vagueness associated with § 123's prohibition against annoying or alarming conduct, the majority's construction and application of subsections (c)(3) and (b) exacerbate the statute's overbreadth and vagueness.

As previously discussed, subsection (c)(3) requires the State to prove, as an element of the § 123 offense, that the defendant's conduct was "[w]ithout a legal purpose." If this provision were given its plain, broad, ordinary meaning, it would materially help to overcome the overbreadth and vagueness inherent in a prohibition against annoying or alarming conduct. Under the plain language of subsection (c)(3), as applied to letters, an illegal purpose would be if the letters solicited someone to commit a crime, or were involved in a criminal conspiracy, or contained threats in violation of another statute, or contained matter in violation of federal law or postal regulations, or were smuggled out of a correctional institution in violation of prison regulations, or discussed plans for an escape from prison. Many other examples of illegal purposes could be set forth. But what is illegal about a series of letters, presumably permitted by prison and postal regulations, from an obsessive former boyfriend containing expressions of religious beliefs, emotional feelings, and apologies for past conduct? In this connection, the trial judge's remarks to Galloway when he was first sentenced to prison in 1995 are pertinent. Judge Thieme, the sentencing judge, then stated:

> "[Y]ou can write her every day. There is nothing I can do about it. You can call her on the phone; there is nothing I can do about it."

The trial judge in the case at bar, in his opinion denying the defendant's pre-verdict motions, seemed to hold that Galloway's letters were without a legal purpose because they were "personal." He did not explain why a "personal" communication is without a legal purpose, whereas a non-personal communication would have a legal purpose. If the meaning of subsection (c)(3) is that all "personal" conduct is "[w]ithout a legal purpose," the subsection would do very little to cure the overbreadth and vagueness inherent in a statute punishing annoying or alarming conduct.

The majority indicates, and I agree, that "legal purpose" has a clearer and more definite meaning than the phrase "legitimate purpose" found in some statutes which have been invalidated in other jurisdictions, and that " '[l]egal' derives from or is found in law," whereas " 'legitimate' ... encompasses that which is legal and beyond." (Opinion at 636–638). The majority fails to tell us, however, what is not "legal" with respect to sending letters of the type here involved.

Finally, the majority simply concludes its opinion by stating: "It also is evident from the record that Petitioner acted without a legal purpose." (Opinion at 652). We are not informed as to what in the record makes this evident. The Court today gives utterly no meaning to subsection (c)(3) and proceeds as if the element were not in the statute. Under these circumstances, the majority's repeated reliance upon subsection (c)(3), as restrictive language helping to cure § 123's overbreadth and vagueness, leaves one dumbfounded.

The same is true of the majority's treatment of the exception in subsection (b) for "peaceable activity intended to ... provide information to others." Again, if this exception were given its plain, broad, ordinary meaning, it would also help in curing the overbreadth and vagueness in the statutory prohibition against annoying or alarming conduct. And the majority initially indicates that the exception is broad, exempting from the statute's coverage " 'constitutionally protected activity.' " (opinion at 638). Nevertheless, the majority goes on to hold that Galloway's letters expressing religious views, feel-

ings, and apologies do not constitute the expression of constitutionally protected activity. Under the majority's opinion, it would appear that the conduct of a minister of a religious sect, who repeatedly sends unwanted letters or pamphlets setting forth religious views similar to Galloway's, to persons who are seriously annoyed by them, would not fall within the exception in subsection (b) and could be criminally punished. On the other hand, according to the majority, repeated "commercial solicitations" and the sending of "leaflets" concerning "store openings" (opinion at 638), are protected by the exception in subsection (b). The distinctions suggested by the majority concerning subsection (b) are, to say the least, puzzling.

With regard to both the "legal purpose" element in subsection (c)(3) and the exceptions in subsection (b), the majority's ultimate position is set forth towards the end of the opinion where the Court states (Opinion at 650, emphasis supplied):

"After the initial few letters, however, Galloway was warned multiple times that Javin did not wish to receive communications from him. Those instructions notwithstanding, he continued his course by sending a large number of additional letters. From this, a reasonable fact-finder reasonably could conclude that *Galloway's intent was, in fact, to harass Javin, rather than merely to engage in a peaceable activity, with a legal purpose.*"

The majority seems to be saying that, if the intent element of subsection (c)(1) is established, then the "peaceable activity" exceptions in subsection (b) are inapplicable and the "[w]ithout legal purpose" element in subsection (c)(3) is proven. This approach renders subsections (b) and (c)(3) entirely nugatory.

Obviously, under the structure and wording of the statute, one can send a communication with more than a single intent. One can intend "to harass, alarm, or annoy," and also intend to furnish information. If conduct is not accompanied by an "intent to harass, alarm, or annoy," the conduct is not prohibited, and there is no occasion to consider the statutory exemptions in subsection (b) for political views or the providing of information. The exception in § 123(b) for the expression of

political views or the communicating of information only becomes pertinent and meaningful when the expression or communication is with the intent to harass, alarm, or annoy. Under the majority's reasoning, if a candidate for public office repeatedly mails a "plethora"[7] of campaign literature to a particular person, after having been informed that the recipient does not wish to receive such political literature, a factfinder could determine that the candidate had an intent to annoy and that the candidate violated this criminal statute despite the exception for the expression of political views. I do not believe that either the language of § 123 or the First Amendment or Article 40 of the Maryland Declaration of Rights would permit this result.

Similarly, the "[w]ithout legal purpose" element in subsection (c)(3) is totally distinct from the "intent" element in subsection (c)(1). Under Art. 27, § 123, the State must prove both that the defendant had the "intent to harass, alarm, or annoy the other person" and that the defendant's conduct was "[w]ithout a legal purpose." The majority, by contrasting the intent to harass with legal purpose, and suggesting that the intent to harass negates any legal purpose, has merged two distinct elements into one. Furthermore, under the majority's view of the Maryland statute, neither subsection (b) nor subsection (c)(3) can serve as language limiting the overbreadth and vagueness inherent in subsections (c) and (c)(1). If proof of the intent element in (c)(1) means that (b) and (c)(3) are inapplicable, they are obviously not restrictions upon the statute's broad punishment of intentional annoying or alarming conduct.

## C.

The majority opinion acknowledges that courts in other jurisdictions have held that harassment statutes, prohibiting conduct intended "to alarm, annoy, or harass" another person, are unconstitutionally overbroad and/or vague. In fact, the

---

7. Opinion at 650.

majority of cases over the past 30 years, dealing with the constitutionality under the First and Fourteenth Amendments of harassment statutes similar to Maryland's Art. 27, § 123, have held that such statutes are unconstitutional. The Court today, however, purports to distinguish some of those cases on the grounds that the Maryland statute has "inherent limitations" such as the requirement of no "legal purpose" in subsection (c)(3) or the exception for "provid[ing] information to others" in subsection (b), and that the Maryland statute "is salvageable because we shall employ a limiting construction" by inserting the words "reasonable person" in subsection (c)(1). (Opinion at 619). The majority also announces that "we shall not follow those jurisdictions that have found harassment statutes to be unconstitutionally vague." (*Ibid.*).

For the reasons set forth above in Part II B of this dissenting opinion, the "[w]ithout legal purpose" element in subsection (c)(1), and the exceptions in subsection (b), as construed and applied by the majority today, are not "inherent limitations." Instead, the majority's interpretation and application of those provisions enhance the statute's overbreadth and vagueness. Furthermore, as discussed below, the insertion of "reasonable person" language in subsection (c)(1) does not cure the inherent vagueness and overbreadth of a statute which criminally punishes one who intentionally "annoys" or "alarms" someone else, regardless of whether the latter is a "reasonable person."

In rendering his verdict, the trial judge specifically found that Galloway intended "to annoy *or* to harass" within the meaning of subsection (c)(1) (emphasis supplied). The judge, however, did not explain the difference between "annoy" and "harass," if any, and did not say which intent Galloway had.

The Supreme Court in *Coates v. Cincinnati*, 402 U.S. 611, 611–614, 91 S.Ct. 1686, 1687–1688, 29 L.Ed.2d 214, 217 (1971), held that an ordinance which criminally punished persons who assembled on a sidewalk and engaged in "conduct" which was "annoying to persons passing by" was "unconstitutionally vague because it subjects the exercise of the right of assembly to an unascertainable standard, and unconstitutionally broad

because it authorizes the punishment of constitutionally protected conduct." As to vagueness, the Supreme Court continued (402 U.S. at 614, 91 S.Ct. at 1688, 29 L.Ed.2d at 217–218):

"Conduct that annoys some people does not annoy others. Thus, the ordinance is vague, not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all. As a result, 'men of common intelligence must necessarily guess at its meaning.' *Connally v. General Construction Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322, 328.

"It is said that the ordinance is broad enough to encompass many types of conduct clearly within the city's constitutional power to prohibit. And so, indeed, it is. The city is free to prevent people from blocking sidewalks, obstructing traffic, littering streets, committing assaults, or engaging in countless other forms of antisocial conduct. It can do so through the enactment and enforcement of ordinances directed with reasonable specificity toward the conduct to be prohibited. *Gregory v. Chicago,* 394 U.S. 111, 118, 124–125, 89 S.Ct. 946, 950, 953–954, 22 L.Ed.2d 134, 139–140, 143–144 (Black, J., concurring). It cannot constitutionally do so through the enactment and enforcement of an ordinance whose violation may entirely depend upon whether or not a policeman is annoyed."

The same may be said of the "conduct" prohibited by § 123. Except for the statement in subsection (a) that the conduct must be a pattern consisting of a series of acts, neither the words of the statute nor the majority opinion in this case tell us what type of "conduct" is prohibited. The word "conduct" itself covers virtually the entire range of human activity, and the only statutory limitation as to the type of conduct is that it be repeated and seriously annoying or alarming.

The majority's insertion of a "reasonable person" standard does little or nothing to cure the vagueness. The Supreme Court's language in *Coates* is still applicable even with the insertion of a reasonable person standard, *i.e.,* "[c]onduct that annoys some [reasonable] people does not annoy others." 402

U.S. at 614, 91 S.Ct. at 1688, 29 L.Ed.2d at 217. Repeated letters from an obsessive former boyfriend, setting forth his feelings, apologizing for past conduct, and expressing his religious views, might annoy some reasonable recipients but not annoy other reasonable recipients. While some reasonable persons might be annoyed, other reasonable persons might simply ignore such letters, or suggest that the sender "get a life," or suggest that he seek professional help, or view him as immature and foolish, or merely feel sorry for him. Although almost anyone who had previously been a victim of the type of criminal activity that Galloway had committed in 1994 and 1995 would be annoyed and alarmed by the repeated letters, neither the statute nor the majority's interpretation of it is confined to this situation. As earlier discussed, § 123 is not limited to circumstances where there was prior criminal involvement with the victim, or prior threats of harm, or a prior domestic violence protective order. Such a limited statute might well pass constitutional muster. Such a statute, in the language of *Coates v. Cincinnati,* would appear to be "directed with reasonable specificity toward the conduct to be prohibited." 402 U.S. at 614, 91 S.Ct. at 1688, 29 L.Ed.2d at 217.[8] The prohibition of annoying conduct in § 123, however, particularly as interpreted by the majority, is as vague as the prohibition in the statute involved in *Coates.*[9]

The Supreme Court in *Coates* also found that the statute involved was overbroad in violation of the First Amendment,

---

**8.** *Cf. Monhollen v. Commonwealth of Kentucky,* 947 S.W.2d 61 (Ky.App. 1997) (upholding a stalking statute where, under the statutory language, there had been a prior protective order or criminal conviction involving the same victim). The majority opinion in the present case relies on *Monhollen* (opinion at 629–631), although the statute involved in *Monhollen* was obviously more restrictive, clear, and specific than Maryland's Art. 27, § 123.

**9.** In a much more limited statute than Art. 27, § 123, the insertion of a "reasonable person" standard might help to cure some of the vagueness. This was the situation in the Indiana case relied on by the majority (opinion at 628, n. 25), where the statute was restricted to harassing telephone calls. *Kinney v. Indiana,* 404 N.E.2d 49 (1980). Furthermore, the *Kinney* case involved only a challenge under the Indiana constitution. This was also the situation in the California case

saying (402 U.S. at 615–616, 91 S.Ct. at 1688–1689, 29 L.Ed.2d at 218, footnotes and citations omitted):

"But the vice of the ordinance lies not alone in its violation of the due process standard of vagueness. The ordinance also violates the constitutional right of free assembly and association. Our decisions establish that mere public intolerance or animosity cannot be the basis for abridgment of these constitutional freedoms. . . . The First and Fourteenth Amendments do not permit a State to make criminal the exercise of the right of assembly simply because its exercise may be 'annoying' to some people. If this were not the rule, the right of the people to gather in public places for social or political purposes would be continually subject to summary suspension through the good-faith enforcement of a prohibition against annoying conduct. And such a prohibition, in addition, contains an obvious invitation to discriminatory enforcement against those whose association together is 'annoying' because their ideas, their lifestyle, or their physical appearance is resented by the majority of their fellow citizens."

Similarly, the First and Fourteenth Amendments, as well as Articles 36 and 40 of the Maryland Declaration of Rights, would ordinarily preclude a state from criminally punishing one who writes letters expressing feelings, religious views, and apologies, to someone with whom the writer had previously cohabited. Again, while these constitutional provisions might allow such punishment under the particular facts of the present case, neither the statutory language nor the majority's interpretation of the statute is so limited. As the Supreme Court emphasized in *Coates v. Cincinnati,* and numerous other cases, conduct otherwise protected by the First Amend-

---

relied on by the majority (opinion at 628) where the stalking statute there involved was more limited than § 123, as it required *inter alia,* a "credible threat . . . with the intent to place that person in reasonable fear of death or great bodily injury." *The People v. Ewing,* 76 Cal. App.4th 199, 210, 90 Cal.Rptr.2d 177, 184 (1999). In addition, the conviction in *Ewing* was reversed for insufficient evidence.

ment cannot be prohibited or punished merely because it annoys, or angers, or offends, or induces unrest, or is objectionable to, or is obnoxious to others. *See, e.g., Texas v. Johnson,* 491 U.S. 397, 408–409, 109 S.Ct. 2533, 2542, 105 L.Ed.2d 342, 356 (1989) (relying, *inter alia,* on *Coates v. Cincinnati); City of Houston v. Hill,* 482 U.S. 451, 459–467, 107 S.Ct. 2502, 2508–2512, 2512, 96 L.Ed.2d 398, 410–415 (1987) (same); *Gooding v. Wilson,* 405 U.S. 518, 521–528, 92 S.Ct. 1103, 1105–1109, 31 L.Ed.2d 408, 413–418 (1972); *Cohen v. California,* 403 U.S. 15, 21–25, 91 S.Ct. 1780, 1786–1788, 29 L.Ed.2d 284, 291–294 (1971); *Bachellar v. Maryland, supra,* 397 U.S. at 567, 90 S.Ct. at 1314, 25 L.Ed.2d at 573–574. Moreover, the "other persons" referred to in these and similar cases have often been large segments of the general public; consequently, they would seem to include "reasonable persons."

The majority distinguishes the Supreme Court's holdings in *Coates v. Cincinnati,* saying: "The Maryland statute is distinguishable because it proscribes a course of conduct and requires specific intent on the part of the defendant ..." (opinion at 622, n. 16). The ordinance involved in *Coates,* like § 123, prohibited "conduct" which was "annoying." While the *Coates* ordinance may not have required repeated activity, this difference has little or no relevance to the vagueness or overbreadth inherent in punishing "annoying" conduct. The factor of repetition does not clarify the vagueness or overbreadth associated with the words "annoy" or "alarm." The same is true of the adjective "serious" which modifies "annoy." While the requirements of repetition or seriousness may slightly reduce the number of prosecutions under the statute, they shed no light on what constitutes the prohibited "annoying" conduct." Moreover, where activity is protected by the First Amendment and Articles 36 and 40 of the Maryland Declaration of Rights, the protection applies to repeated activity as well as a single episode.[10]

---

**10.** The majority (opinion at 631–632) relies on two cases for the assertion that a requirement of repeated conduct mitigates against

Likewise, the requirement of a specific intent to annoy or alarm in subsection (c)(1) of the Maryland statute does not cast any light on what type of conduct is criminally "annoying" or "alarming." The same vague and broad language used in the initial part of subsection (c) is also used in subsection (c)(1) containing the intent requirement. Prohibiting *intentional* unknown conduct is just as vague as prohibiting unintentional unknown conduct.

Furthermore, activity protected by the First Amendment and Articles 36 and 40 of the Maryland Declaration of Rights remains protected when it is intentional. In fact, most conduct protected by the rights to freedom of speech and freedom of religion is intentional. With a few exceptions not applicable here, neither the element of intent nor the element of malice removes from oral or written speech the protections of the First Amendment and Articles 36 and 40 of the Declaration of Rights. As the Supreme Court pointed out in *Hustler Magazine v. Falwell,* 485 U.S. 46, 53, 108 S.Ct. 876, 880, 99 L.Ed.2d 41, 50 (1988),

> "many things done with motives that are less than admirable are protected by the First Amendment. In *Garrison v. Louisiana,* 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964), we held that even when a speaker or writer is motivated by hatred or illwill his expression was protected by the First Amendment...."

*Coates v. Cincinnati,* as well as many other cases invalidating statutory provisions which attempt to punish annoying conduct, are not distinguishable from the present case on any principled or logical basis.[11] A case involving a prosecution,

---

vagueness, namely *United States v. Smith,* 685 A.2d 380 (D.C.1996), *cert. denied,* 522 U.S. 856, 118 S.Ct. 152, 139 L.Ed.2d 98 (1997), and *Johnson v. Indiana,* 648 N.E.2d 666 (Ind.App.1995). Both of these cases involved stalking statutes which were much more restrictive than Maryland's broad harassment prohibition in Art. 27, § 123. In fact, the Maryland prohibition against stalking is in an entirely different statute, Code (1957, 1996 Rcpl.Vol., 2000 Supp.). Art. 27, § 124.

11. The majority opinion in the case at bar also suggests (opinion at 622, n. 16) that the holdings of *Coates v. Cincinnati* were "put in doubt" by

under a harassment statute similar to Maryland's, for mailing a large number of "annoying" written documents, is *Bolles v. People of Colorado*, 189 Colo. 394, 541 P.2d 80 (1975). The facts in *Bolles* were that the defendant mailed to various homes 2400 pieces of mail. Each piece of mail contained, in a plain envelope, "twelve points of information regarding abortion and its practice. . . . It also included a color brochure portraying numerous aborted fetuses and one live baby." *Bolles*, 189 Colo. at 396, 541 P.2d at 81. The defendant was prosecuted under a Colorado statute which was more limited than Maryland's, and which provided for the punishment of one who "communicates with a person, anonymously or otherwise by telephone, telegraph, mail, or any other form of communication, in a manner likely to harass or cause alarm," and with the "intent to harass, annoy, or alarm another person." In holding that the statute was overbroad and unconstitutional under the First and Fourteenth Amendments,

the opinion in *Colten v. Kentucky*, 407 U.S. 104, 92 S.Ct. 1953, 32 L.Ed.2d 584 (1972). An examination of the subsequent Supreme Court cases reveals utterly no basis for the majority's suggestion. *Colten v. Kentucky* involved a disorderly conduct statute which was entirely different from either the statute involved in *Coates* or the Maryland statute involved in the present case. The statute involved in *Colten* specifically prohibited the refusal "to comply with a lawful order of the police to disperse," and the defendant there did refuse to comply with such lawful crder of the police. The statute in *Colten* was so different from the statute in *Coates* that the Supreme Court's *Colten* opinion does not even cite *Coates*. Nevertheless, the Supreme Court has cited *Coates* with approval and relied on *Coates* in numerous cases decided after *Colten. See, e.g., Texas v. Johnson*, 491 U.S. 397, 409, 109 S.Ct. 2533, 2542, 105 L.Ed.2d 342, 356 (1989); *City of Houston v. Hill*, 482 U.S. 451, 465 n. 15, 107 S.Ct. 2502, 2511–2512 n. 15, 96 L.Ed.2d 398, 414 n. 15 (1987); *Village of Hoffman Estates v. Flipside, supra*, 455 U.S. at 495 n. 7, 102 S.Ct. at 1191 n. 7, 71 L.Ed.2d at 369 n. 7; *Hynes v. Mayor and Council of Borough of Oradell*, 425 U.S. 610, 622, 96 S.Ct. 1755, 1761, 48 L.Ed.2d 243, 254 (1976); *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 216–217, 95 S.Ct. 2268, 2276, 45 L.Ed.2d 125, 135 (1975); *O'Connor v. Donaldson*, 422 U.S. 563, 575–576, 95 S.Ct. 2486, 2494, 45 L.Ed.2d 396, 407 (1975); *Bigelow v. Virginia*, 421 U.S. 809, 816, 95 S.Ct. 2222, 2229, 44 L.Ed.2d 600, 608 (1975); *Smith v. Goguen*, 415 U.S. 566, 578, 94 S.Ct. 1242, 1249, 39 L.Ed.2d 605, 615 (1974); *Grayned v. City of Rockford*, 408 U.S. 104, 108 n. 4, 110 n. 11, 113, 92 S.Ct. 2294, 2299 n. 4, 2300 n. 11, 2301, 33 L.Ed.2d 222, 227 n. 4, 228 n. 11, 230 (1972).

the Supreme Court of Colorado stated (189 Colo. at 397–398, 541 P.2d at 82):

"However, a statute intended to proscribe unprotected activity must not also proscribe activity protected under the First Amendment.

\* \* \*

"In short, in the First Amendment area, a statute must be narrowly drawn to implement legitimate and constitutional legislative purposes.

"The statute before us in this case is anything but narrowly drawn. It could, of course, be relied upon to punish for obscene, libelous, riotous communication which is probably constitutionally permissible. Yet the crucial factor is that this statute could also be used to prosecute for communications that cannot be constitutionally proscribed.

"To illustrate the overbreadth of this statute, it is useful to first define some of the significant terms used in the statute. According to *Webster's New International Dictionary of the English Language*, (3d ed. Unabridged, 1961), 'annoy' means 'to irritate with a nettling or exasperating effect.' 'Nettling' means 'to arouse displeasure, impatience, or anger in: provoke, vex.' 'Alarm' means 'to arouse to a sense of danger; to put on the alert; to strike with fear; fill with anxiety as to threaten danger or harm.'

"If we substitute these definitions in place of the terms used in the statute, we find that one is guilty of the crime of harassment if he intends to 'alarm' another person-arouse to a sense of danger-and communicates to that other person in a manner likely to cause alarm. It would therefore be criminal in Colorado to forecast a storm, predict political trends, warn against illnesses, or discuss anything that is of any significance.

"So, also, if one has the intent to annoy—to irritate with a nettling or exasperating effect—and he communicates with another in a manner that is likely to cause alarm—to put on the alert—he too is guilty of harassment. The absurdity of this is patently obvious to anyone who envisions our society

in anything but a state of languid repose. The First Amendment is made of sterner stuff."

The lower court in the *Bolles* case had "attempted to save the statute from successful constitutional attack by engrafting onto it a statement that it applied only to conduct engaged in for 'no legitimate purpose.' " *Bolles,* 189 Colo. at 398, 541 P.2d at 83. The Colorado Supreme Court, however, pointed out that the inserted language itself "injects a vagueness into the statute which cannot withstand First Amendment scrutiny." *Ibid.* The same is true of the "[w]ithout legal purpose" element of the Maryland statute as construed and applied by the majority today.

With respect to the prosecution's argument in *Bolles* that a recipient's "right of privacy in the home justifies the broad wording of the subsection in question" (189 Colo. at 399, 541 P.2d at 83), the Supreme Court of Colorado responded (*ibid.*):

"Use of the mail to convey one's message no doubt encroaches on the sanctity of the home; however, the intrusion into the recipient's privacy is only minimal since he is not only free to discard at once any mail that he does not wish to receive, but can also ensure that he will not receive any more like it from the sender. *See Rowan v. United States Post Office Department, supra.*"

Factually similar to the present case is *Kramer v. Price,* 712 F.2d 174 (5th Cir.1983), in which the United States Court of Appeals for the Fifth Circuit, in an opinion by Judge John Minor Wisdom, held that the Texas harassment statute was unconstitutionally vague. The Texas statute was also more specific than Maryland's harassment statute, as the proscribed conduct under the Texas statute was limited to certain types of telephone and written communications. It provided for the punishment of one who intentionally "communicates by telephone or in writing in vulgar, profane, obscene, or indecent language or in a coarse and offensive manner" and, by such "action intentionally, knowingly, or recklessly annoys or alarms the recipient," 712 F.2d at 176. The defendant in the *Kramer* case was a former girlfriend of John Keiser, who had

cohabited with Keiser, and who, after Keiser's marriage to another woman, had mailed to him letters and postcards that "were so voluminous that they filled two to three grocery sacks." *Id.* at 175 n. 1. Also, one of the letters was clearly threatening to Keiser's and his wife's new baby. The United States Court of Appeals for the Fifth Circuit, relying on and quoting from *Coates v. Cincinnati, supra,* and pointing to the "inherent vagueness" in "the terms 'annoy' and 'alarm,'" held that "the statute falls on vagueness grounds." *Id.* at 178.[12]

Other cases holding similar statutory language unconstitutional, on overbreadth and/or vagueness grounds, include, *e.g., People v. Hickman,* 988 P.2d 628, 641–642 (Colo.1999) ("'act of harassment' as used in [the statute] encompasses a substantial amount of constitutionally protected communications"); *People v. Norman,* 703 P.2d 1261, 1266–1267 (Colo.1985) ("the terms 'annoy' and 'alarm,' when given their conventional meanings, [are] so broad that the most innocuous comment about a debatable or unpleasant topic might subject a person to criminal prosecution under" the harassment statute); *Thelen v. State,* 272 Ga. 81, 82, 526 S.E.2d 60 (2000) (relying on *Coates v. Cincinnati,* the court invalidated on vagueness grounds the proscription of specified conduct which "annoys" others); *People v. Klick,* 66 Ill.2d 269, 5 Ill.Dec. 858, 362

---

**12.** The majority opinion correctly points out (opinion at 624–625) that the United States Court of Appeals in *Kramer,* with regard to vagueness, relied upon the failure of the Texas Courts to interpret the statute as incorporating a "reasonable person standard." What the majority opinion overlooks or blurs, is that the court in *Kramer* found *two* "infirmities" in the Texas statute which could have been cured by state court interpretations but were not. The first was that the "Texas Courts have made no attempt to construe the terms 'annoy' and 'alarm' in a manner which lessens their inherent vagueness." 712 F.2d at 178. The second was that "the Texas courts have refused to construe the statute to indicate whose sensibilities must be offended." *Ibid.* While the *Kramer* court may have emphasized the second infirmity, the opinion clearly indicates that either would require the invalidation of the statute on vagueness grounds. In the context of the Maryland statute, for the reasons previously set forth, I do not believe that the insertion of a "reasonable person" standard cures either the vagueness or the overbreadth. In this connection, it should be noted that the *Kramer* opinion was limited to the ground of vagueness; it did not discuss overbreadth.

N.E.2d 329 (1977) (invalidating on overbreadth grounds, based on *Coates v. Cincinnati* and similar cases, a statute proscribing telephone calls with intent to annoy); *State v. Bryan,* 259 Kan. 143, 147–148, 910 P.2d 212, 216–217 (1996) (pointing out that, since *Coates v. Cincinnati,* "[o]ther courts have followed the holding in *Coates* in determining that statutes prohibiting annoying conduct are impermissibly vague"); *State v. Jamgochian,* 109 R.I. 17, 24, 279 A.2d 923, 927 (1971) (holding unconstitutional, under *Coates v. Cincinnati,* that portion of an ordinance making it unlawful for a person to stand on a sidewalk and, *inter alia,* "annoy passers-by"); *May v. State,* 765 S.W.2d 438, 440 (Tex.Crim.App.1989) ("the inherent vagueness of the statute …, in attempting to define what annoys and alarms people, … causes it to be unconstitutionally vague"); *City of Everett v. Moore,* 37 Wash.App. 862, 866, 683 P.2d 617, 619 (1984) (In holding that provisions of an harassment statute are invalid under *Coates v. Cincinnati* and similar cases, the court stated that the statute "does not draw a reasonably clear line between the kind of annoying conduct which is criminal and that which is not"); *State v. Dronso,* 90 Wis.2d 110, 116–117, 279 N.W.2d 710, 714 (1979) ("A statute which subjects a telephone caller to criminal sanctions … for calling with intent to annoy … is overbroad as it may reasonably be interpreted to prohibit free speech which is constitutionally protected by both the United States and Wisconsin Constitutions").[13]

---

**13.** At times the majority opinion in the case at bar makes flat statements about what is and what is not covered by Art. 27, § 123, without setting forth any satisfactory basis for the statements. For example, as to whether the prohibition of "a course of conduct that alarms or seriously annoys another person" covers "[tele]phone calls from creditors," the majority states that the statute "was in no way intended to cover such situations," and cites its discussion of the legislative history. (Opinion at 635–637). Nothing in the legislative history set forth in the majority opinion (*id.* at 612–613) lends the slightest support to the majority's assertion. While the report of the Senate Judicial Proceedings Committee, quoted by the majority, refers to "disputes between neighbors, [and] former boyfriends and girlfriends," the report goes on to refer to harassment generally. What might be covered beyond neighbor disputes and boyfriend-girlfriend disputes is not disclosed by either the legislative history or the statutory language. The history and

### D.

As previously discussed, a narrowly drawn statute targeting conduct like Galloway's, under the circumstances here, might well be constitutional. Moreover, § 123 itself might well be constitutional if the majority were willing to give effect to the plain language of subsection (b) which broadly exempts the providing of information and of subsection (c)(3) which requires the State to prove illegality of purpose. Giving effect to the plain language of subsections (b) and (c)(3) would substantially limit and clarify the broad and vague words in (c) and (c)(1). Of course, giving effect to the words of subsections (b) and (c)(3) would require a reversal of Galloway's conviction in the present case. With all due respect, it is anomalous that the majority is willing to re-write subsection (c)(1) in order to sustain the conviction, but it is not willing to apply the literal language enacted by the General Assembly in subsections (b) and (c)(3) which would result in a reversal.

This case is a classic example of the saying that hard cases make bad law. No reasonable person would condone Galloway's atrocious conduct. Nevertheless, sustaining his conviction and 90 day additional sentence is not worth obfuscating the language of statutory provisions or failing to apply important constitutional safeguards.

I would reverse.

Chief Judge BELL and Judge RAKER have authorized me to state that they concur with the views expressed herein and join this dissenting opinion.

statutory language set forth in subsection (c) and (c)(1) are certainly broad enough to cover unwanted repeated telephone calls from creditors and tele-marketers, particularly at dinner time.